# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| AMERICAN HEALTH CARE ASSOCIATION; TEXAS HEALTH CARE ASSOCIATION; ARBROOK PLAZA; BOOKER HOSPITAL DISTRICT; HARBOR LAKES NURSING & REHABILITATION CENTER, <br><br> *Plaintiffs*, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare & Medicaid Services; CENTERS FOR MEDICARE & MEDICAID SERVICES, <br><br> *Defendants*. | Case No. _____ <br><br><br> **COMPLAINT** |

## INTRODUCTION

1.      On May 10, 2024, the Centers for Medicare and Medicaid Services ("CMS") issued a rule imposing onerous new minimum-staffing requirements on virtually all U.S. nursing homes.  *See* 89 Fed. Reg. 40876 (May 10, 2024) ("Final Rule").  That rule exceeds CMS's statutory authority, effects a baffling and unexplained departure from the agency's longstanding position, and creates impossible-to-meet standards that will harm thousands of nursing homes and the vulnerable Americans they serve.

2.      Decades ago, Congress established two basic staffing requirements for nursing homes that participate in Medicare or Medicaid—as more than 97% of U.S. nursing homes do.  First, a nursing home "must use the services of a registered professional nurse [("RN")] for at least 8 consecutive hours a day, 7 days a week." 42 U.S.C. §1396r(b)(4)(C)(i); *accord id.* §1395i-3(b)(4)(C)(i).  Second, a nursing home "must provide 24-hour licensed nursing services which are sufficient to meet the nursing needs of its residents."  *Id.* §1396r(b)(4)(C)(i); *accord id.* §1395i-3(b)(4)(C)(i).

3.      Over the years, Congress has considered alternative regulatory approaches, including proposals to replace the flexible sufficient-staffing requirement with a one-size-fits-all numerical minimum staffing requirement.  But each time, Congress has declined to adopt such proposals, and instead concluded

that the adequacy of nursing home staffing should be determined flexibly based on the particularized needs of each facility.

4.     Dissatisfied with Congress' judgment, CMS decided to take matters into its own hands.  At the direction of the President, the agency proposed and has now adopted a rule that overrides both of Congress' statutory requirements.

5.     The Final Rule explicitly—and brazenly—"revises" the first requirement by tripling it, replacing Congress' directive to employ an RN for 8 consecutive hours, 7 days a week, with CMS's own directive to have an RN "onsite 24 hours per day, for 7 days a week."  89 Fed. Reg. at 40898, 40997.  And the Final Rule departs from the second statutory staffing requirement too, replacing the flexible qualitative standard Congress chose with three rigid quantitative requirements.  Instead of following Congress' decision to require nursing services "sufficient to meet the nursing needs" of each facility's residents, 42 U.S.C. §1396r(b)(4)(C)(i), the Final Rule demands that every facility across the nation— regardless of its residents' actual needs—provide (i) total nurse staffing of at least 3.48 hours per resident day ("HPRD"), including (ii) RN staffing of at least 0.55 HPRD and (iii) nurse aide ("NA") staffing of at least 2.45 HPRD.  89 Fed. Reg. at 40877.

6.     CMS does not even try to claim that the statutory provisions in which Congress explicitly addressed staffing requirements empower it to enact these

sweeping new mandates.  CMS instead claims that this power is lurking in "various provisions" of the Medicare and Medicaid Acts that enable the agency to promulgate requirements promoting resident health and safety.  *Id.* at 40879, 40890-91.  But that argument runs headlong into basic principles of administrative law, as generic rulemaking provisions do not empower agencies to "revise" legislative enactments and promote their own policy *du jour* over the policy choices that Congress enacted into federal law.

7.     That is particularly clear here given the long history of congressional action in this area, the staggering breadth of the regulatory authority CMS now asserts, and the massive economic and political significance of that assertion.  Even by CMS's low-ball estimate, nursing homes will need to spend *more than $40 billion* over the next decade to comply with these new staffing requirements.  Congress has never delegated to CMS the authority to impose such onerous and unachievable mandates on practically every nursing home in the country.

8.     Even if Congress had delegated CMS the authority it claims, the agency's decision to adopt the new minimum-staffing standards was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA").  It simply makes no sense to impose a blanket 24/7 RN requirement and rigid staffing ratios on thousands and thousands of nursing homes across the country, regardless of each particular facility's local conditions and unique circumstances.  As CMS and its

predecessor agencies have repeatedly explained in a series of regulations spanning more than four decades, the indisputable fact that nursing homes care for a wide range of resident populations with greatly divergent needs renders a one-size-fits-all approach manifestly inappropriate. The Final Rule is an unjustified about-face from that longstanding agency position, which has engendered significant reliance interests.

9. Those problems are only exacerbated by the irrational and unattainable staffing levels that the Final Rule imposes. As CMS openly acknowledges, its new mandates "exceed the existing minimum staffing requirements in nearly all" of the 38 States (plus the District of Columbia) that have adopted such requirements, and will require increased staffing "in more than 79 percent of nursing facilities nationwide." *Id.* at 40877. Setting one-size-fits-all staffing requirements that will require some *four-fifths* of the nation's nursing homes to hire additional personnel, even though almost *no* state has deemed those higher levels necessary in light of its particular local conditions, and CMS itself has found that most nursing homes are already providing more-than-adequate care with their present staffing levels, is the height of arbitrary and capricious agency action.

10. Still worse, CMS failed to adequately account for the ongoing shortage of RNs and NAs—a shortage that will be exacerbated by the artificial demand that the agency's mandate will produce nationwide, making compliance practically

impossible in many parts of the country.  Texas is a case in point: The Final Rule estimates that nursing homes in Texas will need to hire about 2,579 additional RNs, representing an increase of 46.1% over current staffing, as well as 7,887 additional NAs, for an increase of 28.4%.  *See* 89 Fed. Reg. at 40957, 40976-80.  Texas simply does not have enough RNs and NAs to sustain these massive increases.  On the other hand, Texas has a relatively high proportion of licensed vocational nurses ("LVNs"),[1] but the Final Rule largely ignores their important contributions to resident care. Further, the Final Rule will have a disproportionate impact on smaller, rural facilities, which will struggle to compete with larger, better-funded urban facilities vying to attract new hires from the limited pool of RNs and NAs.  *See* AHCA Comments on Proposed Rule 21, 31 (Nov. 6, 2023), ("AHCA Cmt."), https://www.regulations.gov/comment/CMS-2023-0144-43877.[2]

---

[1] Most states use the term "licensed practical nurse" ("LPN"), but Texas and California use the term LVN.  *See* 87 Fed. Reg. 22720, 22790 (Apr. 15, 2022).  LPNs and LVNs generally have 1-2 years of postsecondary education, *e.g.*, an associate's degree, whereas NAs generally have only a high school diploma and have completed a state certification program.  *See id.*

[2] *See also, e.g.*, Elizabeth Dougherty, *If You Build It: Rural Hospitals Are Closing, but Those That Remain Are Reshaping and Innovating*, Harvard Medicine: Rural Health Issue, Spring 2017 ("Approximately 77 percent of rural countries in the United States are so-called medical deserts, owing to a shortage of primary care professionals."); Lina Khan, *Q&A with Lina Khan, Chair of the U.S. Federal Trade Commission and Mark Glick, Professor of Economics at the University of Utah*, 2023 Utah L. Rev. 757, 763 (2023) ("[T]he stakes are particularly dire, given that we can see the emergence of healthcare deserts, like in rural communities with high prices and staffing shortages. I mean this is really life and death stuff.").

11.     Even if nursing homes could somehow find enough qualified jobseekers to meet CMS's arbitrary RN and NA thresholds, they are in no position to absorb the annual costs of doing so, which by CMS's own (unduly low) estimate will amount to over *$5 billion each year*.

12.     To be clear, all agree that nursing homes need an adequate supply of well-trained staff.   But imposing a nationwide, multi-billion-dollar, unfunded mandate at a time when nursing homes are already struggling with staffing shortages and financial constraints will only make the situation worse.  If CMS's new standards are permitted to take effect, hundreds of nursing homes will likely be forced to downsize or close their doors entirely.  That threatens to displace tens of thousands of nursing home residents from their current facilities, while forcing countless other seniors and family members to wait longer, search farther, and pay more for the care they need.  The Final Rule thus promises to be a nightmare not only for owners and operators of nursing homes, but also for the vulnerable residents they serve, in direct derogation of CMS's statutory mandate.

13.     In short, the staffing requirements in the Final Rule flunk basic principles of administrative law at every turn.  Plaintiffs respectfully seek a judicial declaration that the 24/7 RN requirement and all three HPRD requirements exceed CMS's statutory authority and are arbitrary and capricious in violation of the APA,

and an order setting aside those requirements and permanently enjoining Defendants from enforcing them.

## **THE PARTIES**

14.    Plaintiff American Health Care Association ("AHCA") is the largest association in the United States representing long-term and post-acute care providers, with a membership of more than 14,000 facilities.  It maintains its principal place of business in Washington, DC.  Many of AHCA's member facilities participate in both Medicare and Medicaid, while some participate only in Medicare and some participate only in Medicaid.  AHCA brings this action on behalf of its member facilities, to prevent the economic and other injuries that the Final Rule will cause them absent judicial relief.

15.    Plaintiff Texas Health Care Association ("THCA") is the largest association of long-term care providers in the State of Texas.  It maintains its principal place of business at 1108 Lavaca Street, Suite 500, Austin, TX 78701. THCA represents several hundred licensed non-profit and for-profit skilled nursing facilities, specialized rehabilitation facilities, and assisted living facilities in Texas. Many of THCA's member facilities participate in both Medicare and Medicaid, while some participate only in Medicare and some participate only in Medicaid. THCA brings this action on behalf of its member facilities, to prevent the economic and other injuries that the Final Rule will cause them absent judicial relief.

16.     Plaintiff Arbrook Plaza is a nursing facility that participates in both Medicare and Medicaid.  Arbrook Plaza is a member of AHCA and THCA, with its principal place of business at 401 W Arbrook Blvd, Arlington, TX 76014.

17.     Plaintiff Booker Hospital District is a political subdivision of the State of Texas, located in Lipscomb County.  *See* Tex. Spec. Dist. Code §§1003.003, 1003.004.  Among other things, Booker Hospital District operates Twin Oaks Manor ("Twin Oaks"), a nursing facility serving residents of rural Lipscomb County, with its principal place of business at 112 Pioneer Drive, Booker, TX 79005.  Twin Oaks participates in Medicaid but not Medicare.

18.     Plaintiff Harbor Lakes Nursing and Rehabilitation Center ("Harbor Lakes") is a long-term care facility that participates in both Medicare and Medicaid.  Harbor Lakes is a member of AHCA and THCA, with its principal place of business at 1300 2nd Street, Granbury, TX 76048.

19.     Defendant Xavier Becerra is the Secretary of the United States Department of Health and Human Services ("HHS").  Defendant Becerra oversees the Medicare and Medicaid programs and approved the Final Rule at issue in this litigation.  *See* 89 Fed. Reg. at 41,000.  Defendant Becerra is sued in his official capacity only.

20.     Defendant HHS is a federal agency organized under the laws of the United States.  It is responsible for administering federal healthcare policy and is the

cabinet-level department of which the Centers for Medicare & Medicaid Services ("CMS") is a part.

21.     Defendant Chiquita Brooks-LaSure is the Administrator of CMS and is sued in her official capacity only.

22.     Defendant CMS is a federal agency organized under the laws of the United States.  It is responsible for the federal government's administration of Medicare and Medicaid.

<u>**JURISDICTION AND VENUE**</u>

23.     This Court has jurisdiction over this action under 28 U.S.C. §1331 and has authority to grant the relief requested under the Administrative Procedure Act, 5 U.S.C. §§701-706, and the Declaratory Judgment Act, 28 U.S.C. §§2201-2202.

24.     While Congress has restricted federal-question jurisdiction over claims that arise under only the Medicare Act, *see* 42 U.S.C. §1395ii, that provision does not apply to the present lawsuit for two independent reasons.  First, §1395ii does not bar facilities that participate in both Medicare and Medicaid from bringing a pre-enforcement challenge that "arises under both Acts," "has an independent basis in the Medicaid Act[,] and is not inextricably intertwined with a claim for benefits under the Medicare Act."  *Avon Nursing & Rehab. v. Becerra*, 995 F.3d 305, 312 (2d Cir. 2021); *accord Texas v. Becerra*, 575 F.Supp.3d 701, 712 (N.D. Tex. 2021) (Kacsmaryk, J.).  Second, §1395ii does not apply to entities that participate *only* in

Medicaid (and not Medicare), as their challenges indisputably arise only under the Medicaid Act. Plaintiff Booker Hospital District operates a Medicaid-only facility (namely, Twin Oaks), and Plaintiffs AHCA and THCA have several members who likewise participate only in Medicaid.

25.     Venue is proper under 28 U.S.C. §1391(e) because (1) the Defendants are federal agencies and federal officers sued in their official capacity; (2) Plaintiffs Arbrook Plaza, Booker Hospital District, and Harbor Lakes reside in this District; and (3) a substantial part of the events giving rise to the claim occurred in this District.

## BACKGROUND

### A.     Overview of the Medicare and Medicaid Programs

26.     In 1965, Congress created the Medicare and Medicaid programs through amendments to the Social Security Act. *See generally* Pub. L. No. 89-97, 79 Stat. 286 (July 30, 1965). Medicare is a federal program that provides health insurance to individuals 65 and older, as well as those with certain disabilities or conditions. *See* 42 U.S.C. §1395c. Medicaid is a joint federal-state program that provides health insurance to low-income individuals. *See id.* §§1396-1, 1396a.

27.     Nursing homes that wish to participate in Medicare must meet the statutory requirements for "skilled nursing facilities" set forth at 42 U.S.C. §1395i-3. Nursing homes that wish to participate in Medicaid must meet the largely parallel

set of statutory requirements for "nursing facilities" set forth at 42 U.S.C. §1396r. Collectively, skilled nursing facilities and nursing facilities are referred to as "long-term care" ("LTC") facilities. *See, e.g.*, 87 Fed. Reg. 22720, 22790 (Apr. 15, 2022).

28.   CMS has promulgated a single set of consolidated Medicare and Medicaid regulations that apply to all LTC facilities that participate in either program, or both. *See* 42 C.F.R. § 483.1. More than 97% of nursing homes in the United States participate in at least one of the two programs.[3]

### B.   Historical Federal Regulation of Nursing Home Staffing

29.   For more than half a century, Congress—not CMS or its predecessors—has taken the lead in setting staffing requirements for nursing homes that participate in the Medicare and Medicaid programs. In 1972, Congress amended the Social Security Act to require all "skilled nursing facilities" ("SNFs") participating in either or both programs to "provide[] 24-hour nursing service which is sufficient to meet nursing needs in accordance with the [facility's patient care] policies" and to have "at least one registered professional nurse employed full time." 42 U.S.C. §1395x(j)(6) (1976) (Medicare); *see id.* §1396a(a)(28) (1976) (requiring state Medicaid plans to define "skilled nursing facility" by reference to the Medicare

---

[3] *See* Nat'l Center for Health Stats., U.S. Dep't of Health & Human Servs., *Post-acute and Long-term Care Providers and Services Users in the United States, 2017-2018*, at 9-10 (2022) (stating that 97.8% of nursing facilities are certified under Medicare and 95.4% are certified under Medicaid).

definition).  Congress empowered the Secretary to waive these staffing requirements "to the extent they … require that any skilled nursing facility engage the services of a registered professional nurse for more than 40 hours a week," but only with respect to SNFs in rural areas that met enumerated conditions.  *See* Pub. L. No. 92-603, §267, 86 Stat. 1329, 1450 (Oct. 30, 1972).

30.    In 1973, the Social Security Administration ("SSA") proposed regulations that mirrored Congress' decisions on nursing home staffing requirements.  *See* 38 Fed. Reg. 18620 (July 12, 1973) (SNFs).  Just like the statute, these proposed regulations required SNFs to provide "24-hour nursing service which is sufficient to meet nursing needs in accordance with the [facility's patient care] policies" and at least one "qualified registered nurse employed full-time"—i.e., "during the day tour of duty 5 days a week."  *Id.* at 18625.  During the notice-and-comment period, however, the agency received comments urging it to deviate from Congress' approach by requiring all nursing homes to maintain "a specific ratio of nursing staff to patients."  39 Fed. Reg. 2238, 2239 (Jan. 17, 1974).

31.    The agency considered and expressly rejected that one-size-fits-all approach, explaining that "the variation from facility to facility in the composition of its nursing staff, physical layout, patient needs[,] and the services necessary to meet those needs precludes setting such a figure."  *Id.*  The agency also expressed concern that "[a] minimum ratio could result in all facilities striving only to reach

that minimum and could result in other facilities hiring unneeded staff to satisfy an arbitrary ratio." *Id.*

32.    In 1980, HHS took over the administration of Medicare and Medicaid. It promptly "propos[ed] a general revision" of the regulations governing SNF participation in Medicare and Medicaid. *See generally* 45 Fed. Reg. 47368 (July 14, 1980).  Consistent with SSA's approach in the 1974 rulemaking, HHS declined to propose "any nursing staff ratios or minimum number of nursing hours per patient per day." *Id.* at 47371.  Instead, it proposed "retain[ing] the language in the existing regulations," which closely tracked the governing statutes. *Id.*; *see also id.* at 47378 (requiring "24-hour nursing service with a sufficient number of qualified nursing personnel to meet the total nursing needs of the patient," as well as "a registered nurse full-time, 7 days a week on the day shift").  At the same time, HHS acknowledged that "[s]ome States ha[d] chosen to employ [quantitative staffing] standards," invited them to share their experiences, and announced its intention "to undertake a study on this subject." *Id.* at 47371-72.

33.    As HHS later acknowledged, the agency's proposed overhaul of the SNF regulations in 1980 was "surrounded by controversy" and "met with strong opposition from a variety of sources."  52 Fed. Reg. 38582, 38583 (Oct. 16, 1987). In response, Congress adopted legislation expressly prohibiting HHS from using any appropriated funds to finalize the proposed rule "prior to [its] receipt of revised cost

estimates" and a "General Accounting Office evaluation of the[ir] impact." Pub. L. No. 96-536, §119, 94 Stat. 3166 (Dec. 16, 1980).  The proposed rule was never finalized, but HHS nevertheless followed through on its plan to explore the possibility of minimum-staffing standards, commissioning a multi-year study by the Institute of Medicine ("IoM").  *See* 52 Fed. Reg. at 38583.

34.    The IoM study ratified the agency's longstanding decision not to impose a one-size-fits-all staffing standard on America's nursing homes.  *See* Inst. of Med., *Improving the Quality of Care in Nursing Homes* 101-03 (Mar. 1986), https://archive.ph/KFNCi.  The study emphasized the importance of recruiting, retaining, and supporting adequate numbers of nursing staff, but concluded that "prescribing simple staffing ratios clearly is inappropriate."  *Id.* at 102.  It reached this conclusion in part because of "the complexities of case mix"—that is, individuals within a single facility have "widely differing needs," and some facilities have a much "larger proportion of heavy-care residents" than other facilities.  *Id.* at 102-03.  The study noted the possibility of "prescribing sophisticated staffing standards" that would account for such complexities—e.g., by using "algorithms … to estimate amounts of nursing time needed by residents that are based on functional assessment scores and requirements for special care needs"—but found that this was not feasible at the time.  *Id.* at 102.

35.     In October 1987, HHS again recognized the pitfalls of one-size-fits-all staffing standards in a proposed rule stemming from the results of the IoM study. *See* 52 Fed. Reg. at 38586.  At the time, Congress had defined "intermediate care facilities" ("ICFs") as a class of institutions serving individuals who "require care and services (above the level of room and board)" but "do not require the degree of care and treatment which a hospital or [SNF] is designed to provide."  42 U.S.C. §1396d(c) (1982).  Although the IoM study recommended extending the SNF requirement of 24-hour nursing services to ICFs, HHS was hesitant to do so.  HHS explained that it "wish[ed] to provide maximum flexibility for staffing and to avoid requiring 24 hour nurse staffing if there are cases in which the needs of the residents can be met through the use of other personnel."  52 Fed. Reg. at 38586.  HHS also expressed "concern[] that some facilities would have difficulty in recruiting the nurses necessary to meet the requirement and d[id] not wish to create a situation in which needed nursing home beds are unavailable to program beneficiaries because facilities cannot meet staffing requirements."  *Id.*  Despite these qualms, HHS issued a proposed rule that contemplated extending the existing SNF staffing requirements to ICFs, such that both types of facilities "would be required to have a sufficient number of licensed nurses and other personnel on a 24 hour a day basis, including a registered nurse on duty on the day shift at least 8 hours a day, 7 days a week."  *Id.*

15

36.    In December 1987—less than three months after HHS issued the proposed rule—Congress stepped in once again, enacting extensive revisions to the statutory requirements for nursing homes participating in Medicare and Medicaid. *See* Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330 (Dec. 22, 1987) ("OBRA '87")).  With respect to Medicaid, Congress replaced the two-level framework of SNFs and ICFs with a single definition of "nursing facilities" ("NFs"), while retaining the term "SNF" in the Medicare context.[4]  *See id.* §4211(a), 101 Stat. at 1330-183 to 1330-203.  Congress then imposed substantively identical staffing requirements on both SNFs and NFs (collectively known as LTC facilities), requiring each such facility to (1) "provide 24-hour licensed nursing service which is sufficient to meet [the] nursing needs of its residents"; and (2) "employ the services of a registered professional nurse at least during the day tour of duty (of at least 8 hours a day) 7 days a week." *Id.* §4201(a), 101 Stat. at 1330-161 (SNF requirement); *accord id.* §4211(a), 101 Stat. at 1330-186 (NF requirement).

37.    Congress further demonstrated its intent to address nursing home staffing through legislation—rather than agency regulation—by enacting detailed rules for when the Secretary may waive the staffing requirements for SNFs, and

---

[4] OBRA '87 redefined "intermediate care facilities" as institutions for individuals with intellectual disabilities.  *See* Pub. L. No. 100-203, §4201(e), (h), 101 Stat. at 1330-203 to 1330-207.

slightly different rules for when a State may waive the staffing requirements for NFs. *Compare id.* §4201(a), 101 Stat. at 1330-163, *with id.* §4211(a), 101 Stat. at 1330-186.  Congress made both types of waivers subject to annual review and renewal. *See id.*; *accord id.* §4201(a), 101 Stat. at 1330-163.  And Congress revisited the waiver issue less than three years later, amending both provisions so that when a waiver is granted, notice must be given to facility residents, members of their immediate families, and relevant state authorities.  *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, §§4008(h), 4801(a), 104 Stat. 1388, 1388-49, 1388-211 (Nov. 5, 1990) ("OBRA '90").

38.    Congress underscored its intent to control nursing home staffing via legislation by instructing the Secretary to "conduct a study and report to Congress no later than January 1, 1992, on the appropriateness of establishing minimum caregiver to resident ratios and minimum supervisor to caregiver ratios for [LTC facilities]," and to "include in such study recommendations regarding appropriate minimum ratios."  Pub. L. No. 101-508, §4801(e)(17), 104 Stat. at 1388-218.  HHS failed to comply with Congress' instructions, however, until 2002—ten years after the statutory deadline.  When the Secretary finally sent Congress a responsive letter, he reported that the study "d[id] not provide enough information to address the question posed by Congress regarding the appropriateness of establishing minimum

ratios."[5]   The Secretary's letter went on to express "serious reservations about the reliability of staffing data at the nursing home level and with the feasibility of establishing staff ratios to improve quality given the variety of quality measures used and the perpetual shifting of such measures." *Id.*  The Secretary also observed that the study "d[id] not fully address important related issues," including "the reality of current nursing shortages." *Id.*  In light of the Secretary's report, Congress declined to make further changes to the statutory staffing requirements for nursing homes that participate in Medicare or Medicaid.

### C.   Statutory Staffing Requirements for Nursing Homes

39.   The statutory staffing requirements for nursing homes have remained substantively unchanged since 1990.  They provide, in relevant part, that each facility must (1) "provide 24-hour licensed nursing services which are sufficient to meet the nursing needs of its residents"; and (2) "use the services of a registered professional nurse for at least 8 consecutive hours a day, 7 days a week."  42 U.S.C. §1396r(b)(4)(C)(i); *accord id.* §1395i-3(b)(4)(C)(i).

---

[5] Letter from Tommy G. Thompson, Sec'y of Health & Human Servs., to J. Dennis Hastert, Speaker of House of Representatives 1 (Mar. 19, 2002) ("Thompson Letter"), reprinted in *Office of Asst. Sec'y for Planning & Evaluation, Dep't of Health & Human Servs., State Experiences with Minimum Nursing Staff Ratios for Nursing Facilities: Findings from Case Studies of Eight States* app. 1 (Nov. 2003), https://archive.ph/wip/KQWPt.

40.   For Medicaid participants, the State in which they operate may waive *both* the requirement that a given facility "provide 24-hour licensed nursing services which are sufficient to meet the needs of its residents" *and* the requirement to use the services of an RN for at least 8 consecutive hours per day, 7 days a week, if:

> **(I)** the facility demonstrates to the satisfaction of the State that the facility has been unable, despite diligent efforts (including offering wages at the community prevailing rate for nursing facilities), to recruit appropriate personnel,

> **(II)** the State determines that a waiver of the requirement will not endanger the health or safety of individuals staying in the facility,

> **(III)** the State finds that, for any such periods in which licensed nursing services are not available, a registered professional nurse or a physician is obligated to respond immediately to telephone calls from the facility,

> **(IV)** the State agency granting a waiver of such requirements provides notice of the waiver to the State long-term care ombudsman (established under section 307(a)(12) of the Older Americans Act of 1965) and the protection and advocacy system in the State for the mentally ill and the mentally retarded, and

> **(V)** the nursing facility that is granted such a waiver by a State notifies residents of the facility (or, where appropriate, the guardians or legal representatives of such residents) and members of their immediate families of the waiver.

*Id.* §1396r(b)(4)(C)(ii).   Further, "[i]f the Secretary determines that a State has shown a clear pattern and practice of allowing waivers in the absence of diligent efforts by facilities to meet the staffing requirements, the Secretary shall assume and exercise the authority of the State to grant waivers."  42 U.S.C. §1396r(b)(4)(C)(iii).

41.     For Medicare participants (i.e., SNFs), the Secretary may waive the requirement to use the services of an RN for at least 8 consecutive hours per day, 7 days a week, if the Secretary finds that:

> **(I)** the facility is located in a rural area and the supply of skilled nursing facility services in such area is not sufficient to meet the needs of individuals residing therein,
>
> **(II)** the facility has one full-time registered professional nurse who is regularly on duty at such facility 40 hours a week,
>
> **(III)** the facility either has only patients whose physicians have indicated (through physicians' orders or admission notes) that each such patient does not require the services of a registered nurse or a physician for a 48-hour period, or has made arrangements for a registered professional nurse or a physician to spend such time at such facility as may be indicated as necessary by the physician to provide necessary skilled nursing services on days when the regular full-time registered professional nurse is not on duty,
>
> **(IV)** the Secretary provides notice of the waiver to the State long-term care ombudsman (established under section 307(a)(12) of the Older Americans Act of 1965) and the protection and advocacy system in the State for the mentally ill and the mentally retarded, and
>
> **(V)** the facility that is granted such a waiver notifies residents of the facility (or, where appropriate, the guardians or legal representatives of such residents) and members of their immediate families of the waiver.

*Id.* §1395i-3(b)(4)(C)(ii).

42.     Shortly after Congress enacted these statutory standards (through OBRA '87 and OBRA '90), HHS promulgated consolidated Medicare and Medicaid regulations that respect Congress' judgment by essentially parroting the statutory

text.  *See* 56 Fed. Reg. 48826, 48874 (Sept. 26, 1991); *see also* 54 Fed. Reg. 5316 (Feb. 2, 1989).

43.    For more than 30 years, CMS faithfully administered the staffing standards established by Congress.  *See* 42 C.F.R. §483.35(a)-(b) (2016).  As recently as 2016, CMS expressly rejected "many comment[s]" urging it to deviate from the statutory standards by "establish[ing] and requir[ing] minimum staffing levels and requir[ing] a registered nurse to be in the LTC facility 24 hours a day, 7 days a week."  81 Fed. Reg. 68688, 68754 (Oct. 4, 2016).  While CMS claimed (without explanation) that it had the statutory authority to impose new standards and suggested that it might do so through future rulemaking, it reiterated its longstanding view that "a 'one size fits all' approach" to nursing home staffing is inappropriate. *Id.* at 68755.

44.    In that 2016 rulemaking, CMS emphasized its ongoing "concerns about [imposing] mandatory ratios" or requiring "a 24/7 RN presence," *id.* at 68756; *see id.* at 68754-56, 68758.  For example, CMS felt it was unable to "determin[e] a 'right' number for any staffing ratio," *id.* at 68576, because "LTC facilities are varied in their structure and in their resident populations," *id.* at 68758; *see also* 80 Fed. Reg. 42168, 42201 (July 16, 2015) (emphasizing the importance of "taking acuity levels into account").  CMS instead opined that the "focus" of its regulations "should be on the skill sets and specific competencies of assigned staff to provide the nursing

21

care a resident needs rather than a static number of staff or hours of nursing care." 80 Fed. Reg. at 42201; *accord id.* at 42200 ("A focus on numbers of nurses fails to address the influence of other staffing factors (for example, turnover and agency staff use), training and experience of staff, and care organization and management.").

45.    CMS also cautioned "that establishing a specific number of staff or hours of nursing care could result in staffing to that number rather than to the needs of the resident population." *Id.* at 42201.   Finally, CMS expressed concern that requiring 24/7 RN presence in every LTC facility "could negatively impact the development of innovative care options, particular[ly] in smaller, more home-like settings," and that "geographic disparity in supply could make such a mandate particularly challenging in some rural and underserved areas."   81 Fed. Reg. at 68755.

### D.    The Final Rule

46.    Things changed dramatically in February 2022, when the Biden Administration announced its intention to "establish a minimum nursing home staffing requirement."    White House, *FACT SHEET: Protecting Seniors by Improving Safety and Quality of Care in the Nation's Nursing Homes* (Feb. 28, 2022), https://archive.ph/wip/xOXxa (capitalization altered).   The Administration tasked CMS with (1) "conduct[ing] a new research study to determine the level and type of staffing needed to ensure safe and quality care"; and (2) "issu[ing] proposed

rules" by February 2023 setting forth "minimum standards for staffing adequacy that nursing homes must meet." *Id.* Shortly thereafter, CMS commissioned a private firm, Abt Associates, to perform the staffing study.

47. The staffing study was not published until June 2023, several months after the Administration's self-imposed deadline for issuing a proposed minimum-staffing rule.[6] And when the study finally was released, it did not support the Administration's desired conclusion. For example, one of its "key findings" was that while recent literature indicates that higher staffing levels are generally correlated with better outcomes, "it does not provide a clear evidence basis for setting a minimum staffing level." Abt Study at xi. The study also concluded that there is "no obvious plateau at which quality and safety are maximized or 'cliff' below which quality and safety steeply decline." *Id.*

48. The study noted that many stakeholders, from nursing home owners and operators to nursing staff interviewees, "emphasized that workforce shortages and current hiring challenges could present barriers to nursing home compliance with a new federal staffing requirement." *Id.* at xxi; *see also, e.g.*, *id.* at xii, xiv, 19, 31-32. But the report ultimately dodged the crucial question of whether it would be feasible to implement a nationwide minimum staffing requirement—despite the

---

[6] *See generally* Abt Associates, *Nursing Home Staffing Study: Comprehensive Report* (June 2023) ("Abt Study"), https://www.cms.gov/files/document/nursing-home-staffing-study-final-report-appendix-june-2023.pdf.

national workforce shortage, uneven workforce distribution, and limited access to training and education programs—on the ground that it "was not a workforce study." *Id.* at xxi.

49.    The study also cited a wealth of evidence and feedback confirming that it makes no sense to mandate staff-to-patient ratios without accounting for variations in resident acuity. *See, e.g.*, *id.* at 2 ("Nursing homes with higher-acuity or more clinically complex residents can require a higher level of staffing to meet resident needs."); *id.* at 17 ("Existing literature confirms the importance of resident acuity in determining staffing needs."); *id.* at 26 ("Direct care respondents (RNs, LPNs, nurse aides) consistently noted that resident acuity was more important than the actual number of assigned residents in determining whether their assignments were reasonable."). That should have come as no surprise to CMS, as the agency and its predecessors repeatedly embraced that very reasoning in rejecting calls to impose staff-to-patient ratios from the early 1970s through 2016. *See, e.g.*, 39 Fed. Reg. at 2239 (explaining that "variation" in "patient needs and the services necessary to meet those needs precludes setting" "a specific ratio of nursing staff to patients"); 80 Fed. Reg. at 42201 (emphasizing the importance of "taking acuity levels into account").

50.    None of that deterred CMS from forging ahead with the Administration's predetermined plan. On September 6, 2023, CMS published a

proposed rule announcing new minimum staffing standards for LTC facilities.  *See* 88 Fed. Reg. 61352 (Sept. 6, 2023).  In response, AHCA, THCA, and a host of other stakeholders submitted detailed comments urging CMS not to adopt its proposed standards.  Stakeholders opposed to the proposed rule included:

- the Medicare Payment Advisory Commission ("MedPAC"), a nonpartisan independent legislative branch agency that provides Congress with analysis and policy advice on the Medicare program;

- LeadingAge, an association of nonprofit providers of services for the aging and other mission-driven organizations serving older adults;

- the American Hospital Association, which represents and serves nearly 5,000 hospitals and health care systems and 43,000 individual members;

- the National Rural Health Association, a national nonprofit organization with thousands of members across the United States;

- the Catholic Health Association of the United States, which is made up of more than 600 Catholic hospitals and 1,600 long-term care and other health facilities in all 50 states;

- Lutheran Services in America, a network of about 300 Lutheran health and human services nonprofit organizations serving 1,400 communities across the country;

- the Association of Jewish Aging Services, a nonprofit that promotes and supports elder services in the context of Jewish values; and

- the National Association of State Veterans Homes, which works to promote and enhance the quality of care that veterans receive.

51.    These and other commenters repeatedly explained that the proposed standards exceeded CMS's statutory authority, contravened Congress' considered

decision to impose qualitative rather than quantitative staffing standards, failed to account for the widely varying circumstances and needs of the thousands of LTC facilities across the country, and threatened to force nursing homes to close their doors and deprive residents of much-needed care.

52.     CMS nevertheless pressed forward.  On May 10, 2024, the agency published the Final Rule in the Federal Register.  *See Medicare and Medicaid Programs; Minimum Staffing Standards for Long-Term Care Facilities and Medicaid Institutional Payment Transparency Reporting*, 89 Fed. Reg. 40876.  The Final Rule imposes two mandatory minimum-staffing requirements on LTC facilities, the second of which includes three mandatory sub-parts.

53.     _24/7 RN Requirement_.  First, the Final Rule replaces the statutory requirement that LTC facilities "use the services of [an RN] for at least 8 consecutive hours a day, 7 days a week," 42 U.S.C. §1396r(b)(4)(C)(i); *accord id.* §1395i-3(b)(4)(C)(i), with a new requirement to "have a registered nurse (RN) onsite 24 hours per day, for 7 days a week that is available to provide direct resident care," 89 Fed. Reg. at 40997.  In other words, it triples the required hours per day of RN services.

54.     _HPRD Requirements._  Second, the Final Rule departs from the qualitative statutory requirement that LTC facilities "provide 24-hour licensed nursing services which are sufficient to meet the nursing needs of its residents," 42

U.S.C. §1396r(b)(4)(C)(i); *accord id.* §1395i-3(b)(4)(C)(i), by instead imposing three rigid quantitative requirements:

- "The facility must meet or exceed a minimum of 3.48 hours per resident day for total nurse staffing," which must include—

- "[a] minimum of 0.55 hours per resident day for registered nurses"; and

- "[a] minimum of 2.45 hours per resident day for nurse aides."

89 Fed. Reg. at 40996.

55.     The Final Rule also extends the statutory waiver for Medicaid participants (*see supra* ¶40) to the new 24/7 RN requirement and the 0.55 RN HPRD requirement, but not the 3.48 total nurse HPRD or 2.45 NA HPRD requirements.  89 Fed. Reg. at 40997-98.  The Final Rule likewise extends the statutory waiver for Medicare participants (*see supra* ¶41) to the new 24/7 RN requirement, but not the HPRD requirements.  89 Fed. Reg. at 40997-98.  Neither of these statutory waivers will provide any widespread relief from the Final Rule's rigid requirements; in fact, despite the long-running, nationwide shortage of nursing staff, less than 0.2% of AHCA's member facilities have been able to obtain those waivers to date as to the existing statutory requirements.

56.     The Final Rule also creates a new, regulatory "hardship exemption" that can be used to obtain a partial exemption from the new 24/7 RN requirement and an exemption from one or more of the HPRD requirements.  *See id.* at 40998.  To

27

qualify for a "hardship exemption," the facility must establish that it meets four criteria:

> (1) "The facility is located in an area where the supply of applicable healthcare staff (RN, nurse aide (NA), or total nurse staffing ...) is not sufficient to meet area needs as evidenced by a provider to population ratio for nursing workforce that is a minimum of 20 percent below the national average, as calculated by CMS";
>
> (2) "The facility demonstrates that it has been unable, despite diligent efforts, including offering at least prevailing wages, to recruit and retain appropriate personnel";
>
> (3) "The facility demonstrates through documentation the amount of financial resources that the facility expends on nurse staffing relative to revenue"; and
>
> (4) "The facility: (i) Posts, in a prominent location in the facility, and in a form and manner accessible and understandable to residents, and resident representatives, a notice of the facility's exemption status, the extent to which the facility does not meet the minimum staffing requirements, and the timeframe during which the exemption applies; and (ii) Provides to each resident or resident representative, and to each prospective resident or resident representative, a notice of the facility's exemption status, including the extent to which the facility does not meet the staffing requirements, the timeframe during which the exemption applies, and a statement reminding residents of their rights to contact advocacy and oversight entities ... ; and (iii) Sends a copy of the notice to a representative of the Office of the State Long-Term Care Ombudsman.

*Id.* at 40998. Notably, the criteria that CMS chose to govern its newly-invented "hardship exemption" differ substantially from the statutory criteria that Congress has set for the statutory waiver scheme. *See supra* ¶¶40-41.

57.    The agency's new "hardship exemption" fails to provide regulated facilities with meaningful relief, as the Final Rule emphasizes that this exemption (like the existing statutory waivers) will be "available only in limited circumstances."  89 Fed. Reg. at 40877; *accord id.* at 40894.  Even if it obtained, moreover, the "hardship exemption" for the new 24/7 RN requirement is only a partial one, as it provides only "an exemption of 8 hours a day"; in other words, a facility that obtains such an exemption must still have an RN "onsite" and "available to provide direct resident care" for at least 16 hours per day, 7 days per week.  *Id.* at 40997-98.  In addition, any facility that receives a hardship exemption from the 24/7 RN requirement "must have a registered nurse, nurse practitioner, physician assistant, or physician available to respond immediately to telephone calls from the facility" whenever there is no RN onsite.  *Id.* at 40997.

58.    A facility may not obtain *any* "hardship exemption" if it has been designated a "Special Focus Facility," which indicates that CMS has "identified [it] as having substantially failed to meet" applicable requirements of Medicare or Medicaid, *see* 42 U.S.C. §§1395i-3(f)(8), 1396r(f)(10); has received a citation from CMS within the past 12 months related to staffing-related issues; or has "failed to submit Payroll Based Journal data in accordance with [42 C.F.R.] § 483.70(p)."  89 Fed. Reg. at 40998.

59.     The Final Rule's policies are to be phased in over the next several years. *Id.* at 40913.  Facilities in non-rural areas must implement the 24/7 RN and the 3.48 total nurse HPRD requirements within 2 years and the 0.55 RN and 2.45 NA HPRD requirements within 3 years. *Id.*  Rural facilities must implement the 24/7 RN and the 3.48 total nurse HPRD requirements within 3 years and the 0.55 RN and 2.45 NA HPRD requirements within 5 years. *Id.*

## E.   Harms to Plaintiffs and the Communities They Serve

60.     CMS estimates that the Final Rule will cost LTC facilities more than $5 billion per year (in 2021 dollars) after the phase-in period.  89 Fed. Reg. at 40970, tbl.22; *see id.* at 40949.  Separate analyses by LeadingAge and CliftonLarsonAllen predict that the costs will be even higher—around $7 billion per year. *See id.* at 40950.  Even under CMS's unduly low estimate, LTC facilities are in no position to cope with this massive, unfunded mandate.  As AHCA explained in its comments on the proposed rule, "nearly 60 percent of [LTC] facilities have negative operating margins."  AHCA Cmt.5.  For AHCA members that are already struggling to stay afloat, the Final Rule imposes additional costs that could force them to close their doors for good.

61.     Compounding the problem, CMS estimates that more than 79% of LTC facilities in the United States—nearly *four-fifths of all facilities*—will have to find additional staff in order to comply with the new minimum-staffing requirements,

which "exceed the existing minimum staffing requirements in nearly all States." 89 Fed. Reg. at 40877. On the national level, CMS projects that the Final Rule will require facilities to hire an additional 15,906 additional RNs to meet the 24/7 RN requirement and 0.55 RN HPRD requirement (a staffing increase of about 11.8%), plus an additional 77,611 NAs to meet the 2.45 NA HPRD requirement and 3.48 total nurse HPRD requirement (a staffing increase of about 17.2%). *See id.* at 40958, 40977-80. These staffing increases will be practically impossible to attain, as LTC facilities are already experiencing major challenges in finding qualified nursing staff even without the Final Rule's massive artificial increase in demand. Many of AHCA's member facilities have vacant nursing positions that have been sitting open for months due to a dearth of qualified candidates. The long-term care workforce remains about 125,000 workers below its pre-pandemic levels; hundreds of thousands of nurses are expected to retire or leave the profession in the coming years; and a shortage of nursing school faculty has contributed to a decrease in nursing program enrollment for the first time in more than two decades.

62.    The Final Rule's adverse effects will be especially pronounced in Texas. According to CMS, "Texas will need to hire the most [additional] RNs" *of any state* to meet the new staffing standards—approximately 653 RNs to comply with the 24/7 RN requirement, plus another 1,926 RNs to comply with the 0.55 RN HPRD requirement. 89 Fed. Reg. at 40957, 40976-80. That is a *46.1%* increase in

the number of RNs employed by LTC facilities in Texas. *See id.* Texas will require approximately 7,887 additional NAs to meet the other HPRD requirements, which represents an increase of 28.4%. *See id.* at 40,978. 40,980. As THCA explained in its comments, Texas simply does not have the manpower to implement these requirements, as it "is already short of thousands of RNs and []NAs." THCA Comments on Proposed Rule 1 (Nov. 6, 2023), https://www.regulations.gov/comment/CMS-2023-0144-43368 ("THCA Cmt."). And while LTC facilities in Texas employ nearly 60,000 LVNs—the second largest number of any State—the Final Rule does not allow hours worked by LPNs/LVNs to be counted toward the NA HPRD requirement, even though LPNs/LVNs complete more education and training than NAs. *Cf.* 89 Fed. Reg. at 40897 (noting that either RNs or LPNs/LVNs—but not NAs—can be used to meet the statutory requirement of 24-hour *licensed* nursing services).

63. CMS acknowledges that Texas facilities alone will collectively need to spend nearly *half a billion dollars* per year to comply with these new requirements— $84 million on the 24/7 RN requirement, and another $409 million on the three HPRD requirements. *See* 89 Fed. Reg. at 40958, 40960, 40983. THCA members are simply unable to absorb these additional costs on top of the rising costs of care, chronic underfunding of Medicaid, and ongoing inflationary factors. THCA Cmt.3.

64.    To make matters worse, CMS is imposing these massive burdens on thousands of LTC facilities that already provide high-quality care for their residents, and already comply with any state-law minimum staffing standards that their state governments have set in light of local conditions.  LTC facilities use a variety of staffing blends to meet the unique needs of their resident populations, and many achieve above-average ratings on health inspections and quality measures even though they do not satisfy CMS's arbitrary new staffing requirements.  The named plaintiffs illustrate the point:

- Plaintiff Arbrook Plaza has a 5-star overall rating from CMS, including quality measures that are "much above average" and health inspections that are "above average."  It delivers these results with an average of 0.18 RN HPRD, 1.17 LVN HPRD, and 2.25 NA HPRD.  Even though Arbrook Plaza receives high marks across the board in terms of resident care, and already complies with the minimum-staffing standards set by Texas law, the Final Rule will force it to begin offering 24/7 RN services, triple its RN HPRD, and significantly increase its NA HPRD.

- Plaintiff Booker Hospital District operates Twin Oaks, which has a 5-star overall rating from CMS.  By CMS's own account, Twin Oaks' staffing is "much above average" and its health inspections are "above average."  Twin Oaks is the only one of the named plaintiffs that is currently in compliance with CMS's new HPRD requirements, and Twin Oaks is also in full compliance with the minimum staffing standards set by Texas law.  Nevertheless, the Final Rule will require Twin Oaks to recruit and hire additional RNs to meet the 24/7 RN requirement—an extremely daunting task for a 61-bed facility located in one of the most rural parts of the Texas panhandle.

- Plaintiff Harbor Lakes has a 5-star overall rating from CMS, including quality measures that are "much above average" and health inspections that are "above average."  It also meets the minimum-staffing standards established by Texas law.  Harbor Lakes is able to provide high-quality

care thanks to a staffing mix that includes 1.1 HPRD of LVN services, which is well above the national average. But the Final Rule irrationally discounts (and largely ignores) the contributions of LVNs, and will therefore force Harbor Lakes to significantly increase its RN and NA staffing. Despite its high quality ratings, the facility does not currently meet the 24/7 RN requirement, the 0.55 RN HPRD requirement, or the 2.45 NA HPRD requirement.

65.     In sum, the Final Rule will impose a significant regulatory burden on each of these facilities, as well as thousands of other LTC facilities represented by AHCA and THCA. That easily suffices to establish Article III standing. *See, e.g.*, *Duarte ex rel. Duarte v. City of Lewisville*, 759 F.3d 514, 518 (5th Cir. 2014) ("[I]f a plaintiff is an object of a government regulation, then that plaintiff ordinarily has standing to challenge that regulation.").

66.     The harms imposed by the Final Rule extend even further. More than 500 nursing homes closed over the course of the COVID-19 pandemic, and very few of them have reopened or been replaced by new facilities. AHCA Cmt.5; *see also* THCA Cmt.3 (noting that "[s]ince March 2020, 56 skilled nursing facilities have closed" in Texas alone). By imposing a massive, unfunded staffing mandate at a time when there is already an inadequate supply of RNs and NAs, the Final Rule will force scores of additional nursing homes to reduce their capacity or even shut down entirely. AHCA Cmt.7-8, 10; THCA Cmt.4. This would have a hugely detrimental effect on access to long-term care. In fact, according to CliftonLarsonAllen's analysis, the Final Rule could cause nearly *one quarter* of

nursing home residents to be displaced from their current nursing home, while forcing countless other seniors and family members to wait longer, search farther, and pay more for the care they need.  AHCA Cmt.7.

## CLAIMS FOR RELIEF

### COUNT ONE
### (APA – Lack of Statutory Authority)

67.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

68.    Like all administrative agencies, CMS is a "creature[] of statute," and accordingly "possess[es] only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022); *see also, e.g.*, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act … unless and until Congress confers power upon it.").  That well-established principle dooms the Final Rule, as Congress has not authorized CMS to impose the 24/7 RN requirement or the HPRD requirements.

### A.    The 24/7 RN Requirement

69.    Congress has specified the minimum amount of RN staffing necessary to participate in Medicaid or Medicare:  All LTC facilities "must use the services of a registered professional nurse for at least 8 consecutive hours a day, 7 days a week." 42 U.S.C. §1396r(b)(4)(C)(i); *accord id.* §1395i-3(b)(4)(C)(i).

70.   The Final Rule impermissibly alters this statutory requirement in two distinct ways.   First, it triples the hours of mandatory RN staffing, replacing the 8/7 RN requirement enacted by Congress with a mandate that all LTC facilities "must have a registered nurse (RN) onsite 24 hours per day, for 7 days a week."   89 Fed. Reg. at 40997.   Second, the Final Rule replaces the statutory requirement to "use the services of" an RN, including in administrative or supervisory roles, with a new requirement to have an RN "available to provide direct resident care."   *Id.*

71.   CMS concedes that the statutory provisions setting forth the 8/7 requirement for RN staffing do not empower it to adopt the 24/7 RN requirement. *See* 89 Fed. Reg. at 40891 (disclaiming reliance on §§1395i-3(b)(4)(C) and 1396r(b)(4)(C) as source of statutory authority).   It could hardly be otherwise, as even in the heyday of "*Chevron* deference," a statutory requirement of X was not an invitation for the agency to require 3X.   The agency nevertheless asserts that "various provisions" elsewhere in §§1395i-3 and 1396r contain "separate authority" for this novel requirement, *id.* at 40879, 40890-91, pointing to provisions stating that:

- The Secretary may impose "such other requirements relating to the health and safety of residents or relating to the physical facilities thereof as the Secretary may find necessary." 42 U.S.C. §1396r(d)(4)(B); *accord* 42 U.S.C. §1395i-3(d)(4)(B).

- An LTC facility "must provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-

being of each resident in accordance with a written plan of care." 42 U.S.C. §1396r(b)(2); *accord* 42 U.S.C. §1395i-3(b)(2).

- An LTC facility "must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident." 42 U.S.C. §1396r(b)(1)(A); *accord* 42 U.S.C. §1395i-3(b)(1)(A).

72.     None of these more general provisions supplies authority for replacing the statutory 8/7 RN requirement with a regulatory 24/7 RN requirement. It is well established that "[g]eneral language" in one part of a statute "will not be held to apply to a matter specifically dealt with in another part of the same enactment." *E.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012) (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)). Whatever the scope of the Secretary's general authority to impose "*other* requirements," 42 U.S.C. §§1395i-3(d)(4)(B), 1396r(d)(4)(B) (emphasis added), and flesh out the "services," "activities," and "care" that LTC facilities must provide, *id.* §§1395i-3(b)(1)(A), (b)(2), 1396r(b)(1)(A), (b)(2), it does not include the power to modify the requirements specifically enacted by Congress.

73.     But that is exactly what the Final Rule does. As CMS itself recognizes, the Final Rule "revises" the statutory 8/7 RN requirement codified at 42 U.S.C. §§1395i-3(b)(4)(C)(i) and 1396r(b)(4)(C)(i), replacing it with CMS's preferred 24/7 RN requirement. *See* 89 Fed. Reg. at 40898. That is not a decision that Congress left open for CMS to make. On the contrary, the Social Security Act itself confirms

that the Secretary may not "publish ... rules and regulations" that are "inconsistent with" provisions of the Act.  42 U.S.C. §1302(a); *see also* 89 Fed. Reg. at 40897, 40898-99 (acknowledging that detailed statutory scheme for waiving the 8/7 RN requirement "can only be modified by legislation").  The 24/7 RN requirement plainly flunks that test and must be set aside.  *See* 5 U.S.C. §706(2).

### B.     The HPRD Requirements

74.     The same goes for the Final Rule's HPRD requirements.  Congress has extensively considered whether to enact staff-to-patient ratios for LTC facilities, and Congress specifically chose not to do so.  Instead of a rigid one-size-fits-all quantitative requirement, Congress opted for a flexible qualitative standard:  An LTC facility must provide nursing services "sufficient to meet the nursing needs of its residents."  42 U.S.C. 1396r(b)(4)(C)(i); *accord* §1395i-3(b)(4)(C)(i).

75.     The Final Rule impermissibly substitutes CMS's current policy views for Congress' considered judgment and replaces a flexible standard with a rule of almost comical rigidity and specificity.  By requiring "[a] minimum of 3.48 hours per resident day for total nurse staffing[,] including but not limited to—(i) [a] minimum of 0.55 hours per resident day for registered nurses; and (ii) [a] minimum of 2.45 hours per resident day for nurse aides," it replaces the flexible standard that Congress consciously chose—which accommodates the wide variation in resident needs across different facilities—with an inflexible mandate that each facility meet

an arbitrary numerical staffing threshold.  89 Fed. Reg. at 40996.  Moreover, the requirement to have RN staffing of at least 0.55 HPRD is inconsistent with the statutory requirement to have RN staffing for at least 8 consecutive hours per day— as illustrated by CMS's felt need to extend the statutory waiver that applies to the 8/7 RN requirement to not only the new 24/7 RN requirement but also the 0.55 RN HPRD requirement.  *See* 89 Fed. Reg. at 40997.

76.    Once again, these are not choices Congress has authorized CMS to make.  CMS does not rely on §1395i-3(b)(4)(C) or §1396r(b)(4)(C) as authority for these new requirements.  It instead once again invokes the Secretary's general authority to impose "necessary" requirements relating to residents' health and safety, as well as provisions requiring LTC facilities to "provide services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident," and "promote maintenance or enhancement of the quality of life of each resident."  89 Fed. Reg. at 40879, 40890-91; *see* 42 U.S.C. §§1395i-3(b)(1)(A), (b)(2), (d)(4)(B); 1396r(b)(1)(A), (b)(2), (d)(4)(B).  But none of those provisions empowers CMS to impose rigid HPRD requirements for RNs, NAs, and total nursing staff.  As explained, CMS's general authority over Medicare and Medicaid does not permit it to modify "matter[s] specifically dealt with in another part of the same enactment."  *RadLAX Gateway Hotel*, 566 U.S. at 646; *see also* 42 U.S.C. §1302(a) (Secretary may not promulgate regulations that are "inconsistent with" statutory

requirements).  Congress squarely considered the question of what staffing levels to require from LTC facilities and the relative merits of a flexible standard and rigid rules, and it chose to require only that each facility maintain staffing levels "sufficient to meet the nursing needs of its residents."  42 U.S.C. §§1396r(b)(4)(C), 1395i-3(b)(4)(C).  That leaves no room for CMS to supersede Congress' judgment with its own arbitrary numerical requirements.  And the Secretary's assertion that one-size-fits all HPRD levels "are necessary for resident health, safety, and well-being," 89 Fed. Reg. at 40890, is flatly at odds with Congress' determination that sufficient staffing levels should be determined by reference to the particularized needs of each facility, based on its unique mix of residents with varying needs and levels of acuity.

77.    Notably, the Final Rule makes clear that it will no longer be enough for an LTC facility to meet the statutory requirement to "provide 24-hour licensed nursing services which are sufficient to meet the nursing needs of its residents" by using any suitable combination of RNs, NAs, LPNs/LVNs, and other caregivers and support staff, 42 U.S.C. §1396r(b)(4)(C), as Congress chose to require by statute and as Arbrook Plaza, Twin Oaks, and Harbor Lakes currently do.  Instead, all LTC facilities will now be required comply with new, one-size-fits-all HPRD requirements, even if "the facility assessment indicates that a lower HPRD [is sufficient] or that a 24/7 RN is not required to care for their resident population."  89

Fed. Reg. at 40908.  CMS simply does not have the authority to override Congress'
judgment in this manner.

### C.    Major Questions Doctrine

78.    The history of Congress' actions in this area, the "breadth of the
authority" CMS now asserts, and "the economic and political significance" of that
asserted authority further confirm that CMS does not have the power to impose these
new staffing mandates.  *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).

79.    By promulgating the Final Rule, CMS "adopt[ed] a regulatory program
that Congress ha[s] conspicuously and repeatedly declined to enact itself."  *Id.* at
724.  For more than half a century, Congress—not CMS or its predecessors—has
taken the lead in setting staffing requirements for nursing homes that participate in
the Medicare and Medicaid programs.  *See supra* ¶¶29-38.  And on the rare occasions
when CMS has tried to take a more aggressive approach, Congress has stepped in to
curtail its efforts.  Most notably, Congress has twice acted to *block* major regulatory
changes affecting LTC facilities—first in 1980, when it prohibited HHS from using
appropriated funds to publish final regulations, Pub. L. No. 96-536, §119, 94 Stat.
3166; *see supra* ¶¶32-33, and again in 1987, when it terminated a rulemaking that
proposed new staffing standards by extensively amending the statute, Pub. L. No.
100-203, 101 Stat. 1330; *see supra* ¶¶35-37.   A few years later, Congress
underscored its intent to govern nursing home staffing through legislation—not

41

agency regulation—by specifically instructing HHS to *study* potential minimum-staffing requirements for nursing homes and provide a report with recommendations for *Congress* to consider.  *See supra* ¶38.  Congress has not altered the statutory staffing requirements for LTC facilities since 1990, and the relevant agency regulations have mirrored those statutory standards for well over 3 decades.  *See supra* ¶¶39-45.  All of that history belies any assertion that Congress intended to delegate the issue to CMS.

80.    The economic and political significance of these minimum-staffing rules likewise undermines CMS's claim of regulatory authority.  By CMS's own estimate, the Final Rule would require more than 79% of LTC facilities—nearly *four out of every five* facilities in the country—to increase their staffing levels.  89 Fed. Reg. at 40877.  All told, facilities would need to hire approximately 15,906 additional RNs (a staffing increase of about 11.8%) and 77,611 additional NAs (a staffing increase of about 17.2%).  *See* 89 Fed. Reg. at 40958, tbl.16; *id.* at 40977-80, tbls.25 & 26.  After the initial phase-in period, the Final Rule would cost over $5 billion per year (in CY 2021 dollars)—nearly all of which would be borne by LTC facilities.  *Id.* at 40970, tbl.22; *see id.* at 40949.

81.    These massive burdens could force many facilities to limit their capacity or close entirely, threatening to displace tens if not hundreds of thousands of nursing home residents.  *See* AHCA, *Report: Increasing Nursing Home Staffing*

*Minimums Estimated at $10 Billion Annually* (July 19, 2022), https://archive.ph/wip/dTA9Q (estimating that a minimum staffing level of 4.1 HPRD would threaten to displace as many as 205,000 nursing home residents); *cf.* 89 Fed. Reg. at 40953 (recognizing risk of "closure of facilities due to inadequate staff availability"). Given these huge social and economic impacts, and the absence of "clear congressional authorization," "there is every reason to 'hesitate before concluding that Congress meant to confer on [CMS] the authority it claims." *West Virginia*, 597 U.S. at 725.

## COUNT TWO
### (APA – Arbitrary and Capricious Agency Action)

82. Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

83. The APA's arbitrary-and-capricious standard requires that agency action be "reasonable and reasonably explained." *E.g.*, *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). This standard "is not toothless"; to the contrary, "it has serious bite." *Id.* The court "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Id.* The court must also set aside agency action when the agency "fail[ed] to respond to significant points ... raised by the public comments." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (quoting *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337,

344 (D.C. Cir. 2019)).  And when, as here, an agency changes a longstanding policy, it must "show that there are good reasons for the new policy" and "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'"  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). CMS's adoption of the Final Rule violated these settled requirements several times over.

### A.      One-Size-Fits-All Standards

84.      Over the past 50 years, CMS and its predecessors have consistently rejected calls to deviate from the plain text of the Social Security Act by requiring nursing homes to provide "a specific ratio of nursing staff to patients."  39 Fed. Reg. at 2239.  In 1974, the Social Security Administration explained that "the variation from facility to facility in the composition of its nursing staff, physical layout, patient needs[,] and the services necessary to meet those needs precludes setting such a figure."  *Id.*  In 1980, when HHS took over the administration of Medicare and Medicaid, it expressly declined to propose "any nursing staff ratios or minimum number of nursing hours per patient per day."  45 Fed. Reg. at 47371.  In 1986, an HHS-commissioned study concluded that "prescribing simple staffing ratios clearly is inappropriate," observing that individuals within a single facility have "widely differing needs," and some facilities have a much "larger proportion of heavy-care

residents" than other facilities.[7]  In 2002, the Secretary of HHS informed Congress that after studying the issue for several years, it was not recommending the imposition of minimum-staffing ratios on LTC facilities.  Thompson Letter at 1.  And as recently as 2016, CMS again rejected requests to adopt minimum-staffing rules, reiterating that it is not reasonable to adopt "a 'one size fits all' approach" toward LTC facilities that care for a wide range of resident populations with greatly divergent needs.  81 Fed. Reg. at 68755; *see id.* at 68754-56, 68758.

85.    CMS came nowhere near providing a reasoned explanation for departing from its longstanding position that fixed numerical staffing requirements are inappropriate.  On the contrary, as AHCA explained in its comments on the proposed rule, the agency's basic, oft-reiterated reason for rejecting prior calls to impose blanket minimum-staffing ratios—that "LTC facilities are varied in their structure and in their resident populations," *id.* at 68758—remains equally true today.  *See* AHCA Cmt.6, 9-10, 13-14, 16; Abt Study at 2 ("Nursing homes with higher-acuity or more clinically complex residents can require a higher level of staffing to meet resident needs."); *id.* at 11, 18 (similar).  Indeed, the recent Abt Associates study concluded that the literature on nursing home staffing "has not identified a minimum staffing level required for adequate care quality."  Abt Study at 11.  That is hardly surprising.  To give just one example, LTC facilities that

---

[7] *See* Inst. of Med., *supra*, at 102-03.

specialize in serving especially vulnerable populations, such as individuals with dementia or Alzheimer's disease, naturally require more staffing than facilities serving individuals with far lower levels of acuity. *See id.* at 11-12; *see also* 81 Fed. Reg. at 68755 (explaining that such ratios "could negatively impact the development of innovative care options"). In short, the Final Rule will produce unreasonable over- and under-staffing because there is so much variation among nursing homes.

86. CMS's decision to impose a single, nationwide standard is also unreasonable in view of major differences among the States. State Medicaid rates for nursing home services vary from $170 per day to over $400 per day. AHCA Cmt.6. Some States have a relatively good supply of RNs and NAs, while other States—such as Texas—are facing a massive shortage. *See, e.g.*, 89 Fed. Reg. at 40957, 40976; 81 Fed. Reg. at 6755 (noting "geographic disparity in supply" of nursing staff). Far from "highlight[ing] the need for national minimum-staffing standards," as CMS now claims, the "widespread variability in existing minimum staffing standards" adopted by 38 States and the District of Columbia underscores that "different local circumstances ... make different staffing levels appropriate (and higher levels impracticable) in different areas of the country." *Compare* 89 Fed. Reg. at 40880, *with* AHCA Cmt.6. By imposing fixed nationwide requirements that "exceed the existing minimum staffing requirements in nearly all States," 89 Fed. Reg. at 40877, CMS has cast aside not only Congress' clear command, but the

considered choices of state governments whose various state-law minimum staffing requirements reflect their own particular local conditions.

87.  CMS's attempts to justify its irrational approach are woefully insufficient.  CMS concedes that its 24/7 RN requirement imposes a "one-size-fits-all" requirement, 89 Fed. Reg. at 40908, but tries to avoid that characterization for its HPRD requirements on the ground that the HPRD ratio "is automatically adjusted for size of facility."  *Id.*  Of course, CMS itself previously described "minimum staffing ratios" as "a 'one size fits all' approach," 81 Fed. Reg. at 68755, and rightly so:  As the Final Rule makes clear, and as commenters underscored, the new HPRD requirements—unlike the qualitative standard that Congress chose—do not account for "the variation from facility to facility in the composition of its nursing staff, physical layout, patient needs[,] and the services necessary to meet those needs." AHCA.Cmt.9 (quoting 39 Fed. Reg. at 2239); *see, e.g.*, *id.* at 6, 13-14, 16, 19, 22; *accord* 81 Fed. Reg. at 68758-59 (denying requests to "utiliz[e] a minimum staffing standard" because "LTC facilities are varied in their structure" and in their "residents' acuity and diagnoses").

88.  CMS asserts that the new standards do not need to "account[] for resident acuity" because they represent "minimum baseline standards for safety and quality."  89 Fed. Reg. at 40887; *see id.* at 40877, 40891-95.  But the 24/7 RN requirement can hardly be plausibly described as a minimum-necessary "baseline"

when it *triples* the statutory requirement that has been in place for half a century.  So too for the new HPRD requirements, which CMS itself admits "exceed the existing minimum staffing requirements in nearly all States" that have any.  *Id.* at 40877; *see* 88 Fed. Reg. at 61359; AHCA Cmt.8.  And CMS acknowledges that "more than 79 percent of nursing facilities nationwide" cannot meet the new requirements with their current staff, but its own findings belie the notion that anywhere close to 79 percent of U.S. nursing homes are failing to meet "minimum baseline standards for safety and quality."  89 Fed. Reg. at 40887.  On the contrary, CMS's own survey process indicates that "roughly 95 percent of facilities" are already "providing 'sufficient nursing staff'" without the new requirements.  AHCA Cmt.25.

89.    CMS's explanation for abandoning its decades-old rejection of one-size-fits-all staffing requirements boils down to this:  Some LTC facilities are chronically understaffed, and "evidence demonstrates the benefits of increased nurse staffing in these facilities."  89 Fed. Reg. at 40881; *see id.* at 40893-94.  But the general (and undisputed) proposition that increased staffing in understaffed facilities can lead to better outcomes does not justify mandating a blanket 24/7 RN requirement and three rigid HPRD requirements for all LTC facilities nationwide.  CMS has not offered any reasonable explanation for reversing its longstanding position that high degree of "variation from facility to facility ... precludes setting" any generally applicable "ratio of nursing staff to patients."  39 Fed. Reg. at 2239;

*accord* 81 Fed. Reg. at 6875.  That is because there *is no* reasonable explanation for mandating 24/7 RN coverage and rigid HPRD ratios in all cases.  The agency's decision to impose one-size-fits-all staffing standards on LTC facilities was arbitrary and capricious and must be set aside.

### B.    Unachievable Requirements

90.    The Final Rule is arbitrary and capricious for another reason as well: As detailed in AHCA and THCA's comments on the proposed rule, it will be impossible for many LTC facilities to implement CMS's new minimum-staffing requirements because of the inadequate supply of RNs and NAs.  *See* AHCA Cmt.1-2, 5, 11-13, 18; THCA Cmt.1-2.  As CMS itself acknowledges, its new requirements "exceed the existing minimum staffing requirements in nearly all States" and will require increased staffing "in more than 79 percent of nursing facilities nationwide." 89 Fed. Reg. at 40877.  CMS accordingly estimates that LTC facilities will need to hire an additional 15,906 additional RNs to meet the 24/7 RN requirement and 0.55 RN HPRD requirement (a staffing increase of about 11.8%), plus an additional 77,611 NAs to meet the 2.45 NA HPRD requirement and 3.48 total nurse HPRD requirement (a staffing increase of about 17.2%).  *See id.* at 40958, 40977-80.  In Texas alone, facilities will need to hire about 2,579 additional RNs (an increase of *46.1%*) and 7,887 additional NAs (an increase of 28.4%).  *Id.* at 40,957, 40,976-80. Those increases are beyond impossible at a time when many LTC facilities are

already experiencing extreme difficulty finding qualified RNs and NAs to fill vacant positions, and when staffing shortages are expected only to worsen. *See, e.g.*, AHCA Cmt.5. Put simply, "staffing mandates do not create more caregivers, nor do they drive caregivers to work in long term care." *Id.* at 1.

91. The Final Rule also irrationally discounts the vital role of LPNs/LVNs, who hold nearly 230,000 jobs in LTC facilities across the country and undisputedly "provide important services to [their] residents." 89 Fed. Reg. at 40881; *see* AHCA Cmt.6. As commenters pointed out, the Final Rule creates a perverse incentive for LTC facilities "to terminate LPN/LVNs and replace them with ... [less qualified] nurse aides" in order to meet the 2.45 NA HPRD requirement. CMS recognized this problem in both the proposed rule and the Final Rule, but bizarrely concluded that "[a] total nurse staffing standard will guard[] against" it. 89 Fed. Reg. at 40893; *see* 88 Fed. Reg. at 61366, 61369. That is obviously wrong. For example, a facility that already provides high-quality care through average staffing of 0.55 RN HPRD, 1.25 LVN/LPN HPRD, and 1.7 NA HPRD would satisfy the 3.48 total nurse HPRD requirement but would need an additional 0.75 NA HPRD to satisfy the 2.45 NA HPRD requirement. The Final Rule thus pressures LTC facilities to replace experienced LPNs/LVNs with less-qualified new hires in order to meet CMS's arbitrary quota of 2.45 NA HPRD.

92.     The staggering costs of the Final Rule underscore its arbitrary and capricious nature.  By CMS's own estimate, the Final Rule will cost over $5 billion per year to implement once fully phased in, *see* 89 Fed. Reg. at 40949, 40970; other estimates place the costs as high as $7 billion per year, *see id.* at 40950.  The Final Rule does not provide any additional funding for Medicare or Medicaid, so CMS "assume[s] that LTC facilities ... will bear the[se] costs."  *Id.* at 40949.  As AHCA and THCA explained in their comments, LTC facilities are in no position to take on this huge financial burden.  AHCA Cmt.5; THCA Cmt.3.  Nearly 60 percent of LTC facilities already have negative operating margins; more than 500 LTC facilities closed over the course of the pandemic; and the costs associated with these new staffing mandates would likely force many more facilities to close.  AHCA Cmt.5.

93.     CMS's decision to impose this massive, unfunded staffing mandate, despite the ongoing workforce crisis and economic realities, is neither "reasonable" nor "reasonably explained."  *Cf. Texas*, 40 F.4th at 226.  The Final Rule nowhere denies that there presently are not nearly enough RNs and NAs available to enable the 79 percent of LTC facilities that are not presently in compliance to satisfy the agency's new mandates.  It instead just touts a new initiative that seeks to encourage people to pursue careers in nursing by "investing over $75 million in financial incentives such as tuition reimbursement."  89 Fed. Reg. 40894.  But, as AHCA has explained, this "one-time workforce effort is not going to fix the workforce crisis,"

and it does practically nothing to offset the $5 billion to $7 billion per year in costs that the Final Rule imposes on LTC facilities.

94. CMS asserts that the Final Rule's phase-in period will "allow all facilities the time needed to prepare and comply with the new requirements specifically to recruit, retain, and hire nurse staff as needed." *Id.* But delaying the deadline for compliance does nothing to fix the underlying problems identified by AHCA and THCA. Regardless of whether it goes into effect tomorrow or two or three years from now, the Final Rule is still a multi-billion-dollar unfunded mandate that many LTC facilities will have no realistic way to meet. And there is no reason to think that the shortage of RNs and NAs will ease over the next two to three years; to the contrary, it is projected to become even worse, as "hundreds of thousands are expected to retire or leave the health care profession entirely in the coming years." AHCA Cmt.5; *see id.* at 2 ("The phase-in provisions are frankly meaningless considering the growing caregiver shortage."). CMS says that it "fully expect[s] that LTC facilities will be able to meet [the Final Rule's] requirements," 89 Fed. Reg. at 40894, but it fails to cite any evidence to support this wishful thinking.

95. Finally, CMS's "hardship exemption" process is a wholly inadequate response to the staffing shortage and economic constraints facing LTC facilities. For one thing, such exemptions are available only to facilities that have been surveyed and cited for failure to meet the new staffing standards—and "facilities cannot

request" (or receive) "a survey specifically for the purpose of granting an exemption." *Id.* at 40902. Thus, instead of being able to proactively explain why it should be entitled to an exemption, facilities that cannot meet CMS's arbitrary requirements will face a perpetual risk of being sanctioned for non-compliance. *See* AHCA Cmt.6, 33-34. In all events, the waivers are "no solution for the ongoing nationwide shortage in nursing staff" or the lack of funds available to implement the new requirements. *Id.* at 7. Indeed, CMS repeatedly emphasizes that the hardship exemption is meant for "limited circumstances," 89 Fed. Reg. at 40894, and that many facilities in areas of the country with severe shortages of available RNs and NAs would not qualify for an exemption because there are so many "other requirements" that must be met "to obtain an exemption." *Id.* at 40953.

## PRAYER FOR RELIEF

Plaintiffs pray for the following relief from the Court:

1.    A declaration, pursuant to 28 U.S.C. §2201, that the 24/7 RN requirement exceeds CMS's statutory authority and is arbitrary, capricious, or otherwise unlawful in violation of the APA.

2.    A declaration, pursuant to 28 U.S.C. §2201, that the HPRD requirements exceed CMS's statutory authority and are arbitrary, capricious, or otherwise unlawful in violation of the APA.

3.      An order vacating and setting aside the 24/7 RN requirement and permanently enjoining Defendants from taking any action to enforce that requirement.

4.      An order vacating and setting aside the HPRD requirements and permanently enjoining Defendants from taking any action to enforce those requirements.

5.      Any costs and reasonable attorneys' fees to which Plaintiffs may be entitled by law.

6.      Any further relief that the Court deems just and proper.

Respectfully submitted,

/s/ Thomas C. Riney

Paul D. Clement* (Va. Bar #37915)
Erin E. Murphy* (Va. Bar #73254)
C. Harker Rhodes IV* (Va. Bar #99759)
Joseph J. DeMott* (Va. Bar #93981)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Pro hac vice application forthcoming

Thomas C. Riney
State Bar No. 16935100
Tom.Riney@uwlaw.com
Gavin J. Gadberry
State Bar No. 7563780
Gavin.Gadberry@uwlaw.com
UNDERWOOD LAW FIRM, P.C.
500 S. Taylor, Suite 1200
Amarillo, Texas 79101
(806) 376-5613
Fax: (806) 379-0316

-and-

Brad Timms
State Bar No. 24088535
brad.timms@uwlaw.com
UNDERWOOD LAW FIRM, P.C.
600 Bailey Avenue
Suite 200
Fort Worth, Texas 76107
(817) 885-7529
FAX: (817) 439-9932

*Counsel for Plaintiffs*

May 23, 2024