# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

|  |  |
|---|---|
| AMERICAN HEALTH CARE ASSOCIATION; LEADING AGE; TEXAS HEALTH CARE ASSOCIATION; ARBROOK PLAZA; BOOKER HOSPITAL DISTRICT; HARBOR LAKES NURSING & REHABILITATION CENTER, | ) ) ) ) ) ) ) |
| *Plaintiffs,* | ) ) ) |
| STATE OF TEXAS, | ) ) ) |
| *Consolidated Plaintiff,* | ) ) ) |
| v. | ) ) ) |
| XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare & Medicaid Services; CENTERS FOR MEDICARE & MEDICAID SERVICES, | ) ) ) ) ) ) ) ) ) ) ) ) |
| *Defendants.* | ) ) |

**FILED**

**November 25, 2024**

KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

Case No. 2:24-cv-00114-Z-BR (lead)
Case No. 2:24-cv-171-Z (consolidated)

## BRIEF OF SERVICE EMPLOYEES INTERNATIONAL UNION
## AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

Steven K. Ury, General Counsel*
Monica Jin-Joo Wilk, Assistant General Counsel*
Mac D. McMechan, Law Fellow*
Service Employees International Union
1800 Massachusetts Avenue, NW
Washington, DC 20036
Tel. (213) 440-4547
Fax (202) 429-5565

*Counsel for Amicus Curiae*
*Admitted *pro hac vice*

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ................................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

ARGUMENT ........................................................................................................ 2

I.    The Rule's Minimum Nurse Staffing Requirements Are Well Within CMS's
Statutory Authority ....................................................................................... 2

    A.    There Is a Strong, Direct, and Evidence-Based Link Between Adequately
Staffing LTC Facilities and the Health, Safety, and Well-Being of
Residents ...................................................................................... 3

    B.    The Rule Protects the Health of Nursing Home Residents by Improving
the Quality of Care ....................................................................... 4

    C.    The Rule Protects the Safety of Nursing Home Residents by Minimizing
the Risk of Falls and Other Dangers ............................................ 7

    D.    The Rule Protects the Well-Being of Nursing Home Residents by
Ensuring They Are Treated with Dignity and Compassion ............ 8

II.    Investing in the LTC Workforce by Establishing Minimum Nurse Staffing
Requirements Will Improve Staffing Shortages and Resident Care Throughout the
Industry ....................................................................................................... 10

    A.    Understaffing Is Pushing Nursing Home Workers Throughout the Country
to Their Breaking Point ................................................................ 11

    B.    The Rule Will Address the Nursing Staff Shortage in the LTC Industry by
Reducing Turnover Caused by Chronic Understaffing and Improving
Retention ...................................................................................... 14

    C.    By Creating a Large, Experienced Workforce of Nursing Staff, the Rule
Will Improve Resident Care .......................................................... 17

CONCLUSION ..................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Biden v. Missouri*,
   595 U.S. 87 (2022)......................................................................................2, 3

*Northport Health Servs. of Arkansas, LLC v. U.S. Dep't of Health & Hum. Servs.*,
   14 F.4th 856 (8th Cir. 2021) ...............................................................................2

**Statutes**

42 U.S.C.A. § 1395i-3(b)(3) ...................................................................................8

42 U.S.C. § 1395i-3(d)(4)(B) ..................................................................................2

42 U.S.C. § 1395i-3(f)(1)........................................................................................2

42 U.S.C. § 1396r(b)(3) ...........................................................................................8

42 U.S.C. § 1396r(d)(4)(B) ......................................................................................2

42 U.S.C. § 1396r(f)(1)............................................................................................2

Fla. Stat. § 400.23(3)(b) .........................................................................................18

**Other Authorities**

Allen J. White et al., Abt Associates, *Nursing Home Staffing Study Comprehensive
   Report*  (June 2023)...................................................................................... passim

Ashvin Gandhi et al., *High Nursing Staff Turnover in Nursing Homes Offers Important
   Quality Information*, 40 Health Affairs (Mar. 2021) ...............................................17

Dee Gill, *Codifying the Nursing Home Industry's Elusive, Alarming Turnover Rates*,
   UCLA Anderson Rev. (2021) .................................................................................14

Katherine Anderson et al., *Identifying Failure to Thrive in the Long Term Care Setting*,
   13 J. Am. Med. Dirs. Ass'n (2012)...............................................................6, 7, 11

Medicare and Medicaid Programs; Minimum Staffing Standards for Long-Term Care
   Facilities and Medicaid Institutional Payment Transparency Reporting, 89 Fed. Reg.
   40876 (May 10, 2024).............................................................................................1

Nat'l Consumer Voice for Quality Long-Term Care, *High Staff Turnover: A Job Quality
   Crisis in Nursing Homes* (2022) .......................................................................14, 15

Sebastian Martinez Hickey et al., Econ. Pol'y Inst., *The State of the Residential Long-Term Care Industry* (2022) .......................................................................12, 15, 17

**STATEMENT OF INTEREST**

*Amicus Curiae* Service Employees International Union ("SEIU") is a union of approximately two million working people in the United States, Canada, and Puerto Rico employed in healthcare, property services, and public services. As the largest union of nursing home and long-term care providers in the United States, SEIU represents approximately 150,000 nursing home workers in twenty-three states and the District of Columbia, a majority of whom are certified nursing assistants ("CNAs"). SEIU members who work in nursing homes also include licensed practical nurses ("LPNs"), Registered Nurses ("RNs"), and support staff such as housekeepers, maintenance workers, dietary workers, laundry assistants, and activity aides. SEIU and its members have a strong interest in these cases because the nursing home minimum staffing rule, which sets baseline standards for the provision of adequate care, is necessary to fulfill Congress's mandate to protect the health, safety, and well-being of residents at long-term care ("LTC") facilities, including those served by SEIU members.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

SEIU submits this brief to highlight the real-life experiences of nursing staff who have endured the struggle of caring for nursing home residents without adequate staffing, and to demonstrate why minimum staffing requirements at LTC facilities participating in the federal Medicare and Medicaid programs are necessary to protect resident health and safety. Following an exhaustive review of available data, a significant body of research, and public comments, the Centers for Medicare and Medicaid Services ("CMS") promulgated a rule to ensure the provision of adequate care by setting a bare minimum nurse staffing standard at LTC facilities that care for seniors, people with serious health conditions, and individuals with disabilities. *See* Medicare and Medicaid Programs; Minimum Staffing Standards for Long-Term Care Facilities and Medicaid Institutional Payment Transparency Reporting, 89 Fed. Reg. 40876 (May 10, 2024)

(hereinafter the "Rule"). As detailed below, the lived experiences of SEIU members illustrate that the minimum nurse staffing requirements in the Rule are a well-reasoned response to the understaffing crisis plaguing the industry and inextricably linked to the protection of the health, safety, and well-being of LTC facility residents.

**ARGUMENT**

### I.    The Rule's Minimum Nurse Staffing Requirements Are Well Within CMS's Statutory Authority

The text of the Social Security Act (the "Act") leaves no doubt that Congress has empowered the Secretary of Health and Human Services (the "Secretary"), acting through CMS, to set health and safety standards for LTC facilities, including rules ensuring the adequate provision of nursing care. The Act expressly provides that the Secretary is responsible for issuing regulations and establishing "requirements relating to the health, safety, and well-being of residents" in LTC facilities. 42 U.S.C. § 1395i-3(d)(4)(B); *accord* 42 U.S.C. § 1396r(d)(4)(B). Further, Congress has commanded the Secretary "to assure that requirements which govern the *provision of care* in nursing facilities . . . are adequate to protect the health, safety, welfare, and rights of residents." 42 U.S.C. § 1396r(f)(1) (emphasis added); *accord* 42 U.S.C. § 1395i-3(f)(1). The Secretary's statutory authority includes substantial latitude as to how best to effectuate the Act's purposes. *Northport Health Servs. of Arkansas, LLC v. U.S. Dep't of Health & Hum. Servs.*, 14 F.4th 856, 870 (8th Cir. 2021) ("The [Medicare and Medicaid] statutes are broadly worded to give HHS significant leeway in deciding how best to safeguard LTC residents' health and safety and protect their dignity and rights.").

By empowering the Secretary to establish health and safety standards for LTC facilities, the Act authorizes CMS to impose minimum requirements for nurse staffing to ensure residents receive the care they need. As the Supreme Court explained in *Biden v. Missouri*, 595 U.S. 87

(2022) (*per curiam*), the Secretary's authority to protect patient health and safety encompasses the power to "impose[] conditions of participation that relate to the qualifications and duties of healthcare workers themselves" to ensure the safe and effective provision of healthcare. *Id*. at 95. Both objective research and the testimony of nursing home workers who routinely experience the ordeal of caring for residents while understaffed confirm the rational connection between the need for minimum nursing staffing standards and the provision of safe, high-quality, human-centered care. As LeeAnn Webster, a CNA from Colorado Springs with over thirty years of experience in long-term care, explains, "Without the proper staffing, people don't get hydrated, people don't get fed, people don't get changed, people don't get walked, people don't thrive. And you don't have five minutes to hold someone's hand while they're dying."

### A.    There Is a Strong, Direct, and Evidence-Based Link Between Adequately Staffing LTC Facilities and the Health, Safety, and Well-Being of Residents

In 2022, CMS commissioned Abt Associates to conduct a mixed-methods Nursing Home Staffing Study to assess "the level and type of staffing needed to promote acceptable quality and safety, so that residents are not at substantially increased risk of not receiving the safe and quality care they deserve." Allen J. White et al., Abt Associates, *Nursing Home Staffing Study Comprehensive Report* viii (June 2023) (hereinafter the "2022 Abt Study"). The 2022 Abt Study found that nursing staff levels are closely correlated with residents' quality of care, safety, and quality of life. *See id*. at xi–xxi. Plaintiffs attempt to undermine the 2022 Abt Study's conclusions by selectively emphasizing findings that recent literature "does not provide a clear evidence basis for setting a minimum staffing level" and that multivariate models show "no obvious plateau at which quality and safety are maximized or 'cliff' below which quality and safety steeply decline." Pls.' Mem. Supp. Summ. J. 14–15 (quoting the 2022 Abt Study). However, Plaintiffs ignore the fact that the literature reviewed in the Study supported improving

staffing levels in LTC facilities by "underscor[ing] the relationship between nursing home staffing and quality outcomes." 2022 Abt Study at ix.

Moreover, in addition to reviewing existing literature, the 2022 Abt Study's authors conducted extensive original qualitative and quantitative research and analysis; the results of which "show that there is an association between nurse staffing levels and the likelihood that nursing homes will exceed acceptable quality and safety thresholds, suggesting a role for policies intended to increase nursing home staffing, such as minimum staffing requirements, particularly those targeting RN and total nurse staffing." *Id*. at 64–65. Notably, the Study's multivariate models indicate that "as minimum required nursing staff [hours per resident day] increase, there is a corresponding increase in potential quality and safety improvements, and a decrease in expected delayed and omitted care." *Id*. at 117. The 2022 Abt Study therefore concluded that, "[a] total nurse staffing requirement would support adequate overall staffing levels to meet clinical and activities of daily living (ADL) tasks while allowing nursing homes discretion in determining the staffing mix most appropriate for their population." *Id*.

### B.    The Rule Protects the Health of Nursing Home Residents by Improving the Quality of Care

The 2022 Abt Study found that "[o]ngoing research continues to demonstrate that nursing homes with higher staff-to-resident ratios provide better care, as indicated by quality measures such as lower prevalence of pressure ulcers, less use of physical and chemical restraints, and lower rates of acute care transfers." 2022 Abt Study at 1 (internal citations omitted). On the other hand, short staffing in nursing homes is associated with lower quality of care, particularly missed or delayed care related to activities of daily living ("ADLs"). *Id*. at 27. In a survey of nursing home workers conducted for the 2022 Abt Study, more than eighty-five percent of respondents cited inadequate staffing as a reason for missed care, which most frequently impacted basic care

4

tasks such as "response to call lights, toileting assistance, oral care, bathing, and ambulation." *Id.* at 27–28.

These findings reflect the particular challenges facing understaffed CNAs, who are responsible for assisting residents with all of their ADLs from eating, dressing, and walking to bathing and toileting. While these responsibilities are essential to maintaining residents' health and quality of life, chronic understaffing leaves CNAs struggling to care for residents, with many rushing to provide even "the bare minimum of care" to keep up with overwhelming assignments. 2022 Abt Study at 26. For Ana Flores, a CNA from Southern California with thirteen years of experience, the explanation for lower quality resident care is simple. "If they give you two or three more patients for yourself [because of higher staffing ratios], that's less time you can spend on others," Ana explained. "Three patients more is less care for everyone."

With mere minutes to attend to each resident under their care, short staffed CNAs are faced with a near impossible task. LeeAnn Webster shared that when she works days, she has "exactly 6.2 minutes to get a human being who is completely dependent on me" washed, dressed, and ready for breakfast. Shelly Hughes, a fifteen-year CNA in Bellingham, Washington, can be responsible for up to thirty residents while working the overnight shift, creating an insurmountable workload. "If we are short staffed, it means not as many rounds are going to get done because that math doesn't work. It takes longer than four minutes to do everything," Shelly explained. "Some people will need help that takes ten to fifteen minutes. While you're there helping them, there may be call lights on and other people needing help, and you hope they will wait for people to come assist them."

When LTC facilities fail to staff enough CNAs to respond to residents' need for help, the consequences can be dire. SEIU members cited bed sores, urinary tract infections ("UTIs"), and cold food as common examples of how short staffing impacts the health of nursing home

residents. Ana cares for some residents who need to be repositioned every two hours to avoid bed sores, which takes fifteen to twenty minutes per resident. However, since she is often responsible for ten or more residents each shift, she has often felt pressed for time to complete all of her duties, which has resulted in the residents not receiving the necessary care every two hours. As LeeAnn explained, "the more patients you have, the longer it takes [to complete bed checks and turns], and sometimes it can take you three to four hours before you can get back to the first patient. So really patients are only turned every four hours."

Bonnie Gaudreau, an LPN and former CNA with over thirty-four years of experience working in nursing homes in Killingly, Connecticut, explained that understaffing can lead to malnourished residents. Many residents need to be fed by CNAs, a task that can take up to an hour. But when Bonnie's facility is short staffed and each CNA is responsible for up to twenty-four residents, CNAs often have to assist other residents before they can finish feeding a resident, leading to cold, unappetizing food. As Bonnie explained, this means the residents "do not thrive because they are not eating as much." "Failure to thrive" in LTC settings means that an individual is declining in physical and psychological health and experiencing symptoms ranging from weight loss, decreased appetite, and poor nutrition to inactivity, lack of interest in other people and social activities, and difficulty with daily activities. Katherine Anderson et al., *Identifying Failure to Thrive in the Long Term Care Setting*, 13 J. Am. Med. Dirs. Ass'n 665.e15, 665.e15 (2012). Bonnie also shared how understaffing compromised her own mother's care during a stay in a nursing home. When short-staffed CNAs took too long to answer her call light and help her use the bathroom, Bonnie's mother soiled herself and ended up contracting UTIs from sitting in her soiled clothes. "It is everywhere," Bonnie said. "It's always staffing. There's never enough."

**C.    The Rule Protects the Safety of Nursing Home Residents by Minimizing the Risk of Falls and Other Dangers**

The unexpected and emergencies happen regularly at nursing homes, which further emphasizes the importance of both the staffing ratio requirement and the 24/7 RN requirement of the Rule for the safety of nursing home residents. The 2022 Abt Study found "consistent relationships between higher RN staffing and lower rates of hospitalizations and outpatient [emergency department] visits" for residents. 2022 Abt Study at 106. By contrast, both research and nursing home worker testimony show that "short staffing can put residents at increased of [sic] risk of poor clinical outcomes, including falls and other conditions that could increase the risk of hospitalization or [emergency department] visits." *Id.* at 104.

Shelly Hughes explained that "falls happen more often when [nursing homes are] short staffed" because of the longer time intervals between resident touches or check-ins. Amy Runkle, a Florida CNA for nearly forty years, noted that many residents have dementia or other conditions that impact their memories, putting them at higher risk of falls and other perils. "They can't walk, but they think they can. They fall trying to go to the bathroom," Amy said. But because of short staffing, "we are not checking them as often as they should. These are elderly people between their 70s and 90s, which is a great time to have a heart attack and stroke. So we need to be checking on them often to make sure they're ok."

SEIU members have had experiences with falls and near-falls happening both with their residents and their own loved ones. LeeAnn Webster shared how once while responsible for thirty-two residents during a shift, she entered a room to find a long-time resident who had tried to get to her bed by herself. LeeAnn ultimately found the resident with her head on the back rail and her legs dangling off the bed, crying. Bonnie Gaudreau shared that her mother-in-law had recently stayed at a nursing home where she fell and had to have an x-ray after trying to get to

7

the bathroom by herself. Even though no one had checked on her for over ninety minutes, Bonnie's mother-in-law did not blame the CNAs because "those girls were running around the whole time" due to the staffing levels. Tanijah Williams, an LPN and former CNA in New Haven, Connecticut, explained that she and her mother visited her grandmother in her nursing home every day to help with her care. "I'd always try to go in between shifts because that's when a lot of falls happen," Tanijah said. "One time, I noticed my grandmother was halfway sitting out of a reclining chair on the side of her bed . . . My grandmother could have fallen, or anything could have happened if we didn't come in at that time."

Falls are a perfect example of the importance of having an RN on site 24/7 because neither CNAs nor LPNs can assess residents after a fall. *See* 42 U.S.C.A. § 1395i-3(b)(3) (providing that "assessment[s] must be conducted or coordinated . . . by a registered professional nurse"); *accord* 42 U.S.C. § 1396r(b)(3). "When a resident falls, we can't really touch them or move them until an RN sees them and checks them out, assesses them," explained Joseph Horen, a CNA in Colorado Springs, Colorado, for the past ten years. "Having RNs on duty and available means we can have a faster response time when a fall is discovered." Without an RN on site, all LPNs and CNAs can do when a resident falls is call the ambulance, and the resident will have to remain on the ground until the ambulance arrives. Having an RN on site means that "when you have someone who has an event, such as a heart attack or fall, you're getting that expertise and resources you need," said LeeAnn. "There have been many times I wish there was someone who knew more than to just call the ambulance."

### D.    The Rule Protects the Well-Being of Nursing Home Residents by Ensuring They Are Treated with Dignity and Compassion

The 2022 Abt Study found that "interviews with nursing home staff, residents, and families indicated perceived improvements in resident-centered care and resident quality of life

associated with higher staffing levels, capturing dimensions of quality beyond what can be captured in existing quantitative data." 2022 Abt Study at 121. Similarly, the stories of SEIU members show that adequate nurse staffing levels are essential to ensure that residents are treated with dignity and compassion. "These are human beings we take care of," said Christina Lockyer, a CNA in Bakersfield, California, with nearly twenty years of experience. "Because of their health, they are vulnerable and need a lot of care . . . but you're still a human, you're still somebody."

In addition to safeguarding health and safety, adequate staffing ensures that nursing home residents can live with dignity. LeeAnn Webster describes the impact on staffing levels on residents as "[t]he difference between whether you're continent or incontinent. Just because you can't move doesn't mean you're not aware. You know you have to pee, you know the call light has been on for twenty minutes, and you're now embarrassed because you couldn't hold your urine for twenty minutes." LaQuitta Brown, a twenty-year CNA in Detroit, Michigan, shared that she had a friend hospitalized over the summer at a nursing facility that made her friend wear a diaper while in treatment, not because she was incontinent but because of her weight and the fact that the facility had insufficient staffing to help with the lifts it would take for her to use the restroom. "That sort of thing, it's a lot," said LaQuitta. "It can break a person down."

LaQuitta believes strongly in the importance of having enough staffing so that CNAs can spend companionship time with residents and make sure they feel like family and not a burden. "I believe that bedside time is lifesaving," she explained. "I believe a couple of people could have survived if they had someone rooting for them, fighting for them, holding their hand and saying, 'It's not your time.' That time is lifesaving to have. That's why I got into this work." Joseph Horen agrees wholeheartedly that, "[t]alking to the residents is so important. Making them feel loved and valued as human beings . . . I have residents who have told me that I have

saved their lives just by talking to them." Bonnie Gaudreau explains that "a lot of healthcare is emotional support and love and attention." For many residents, their caregivers "may be the only person they have in the world," LeeAnn said. "I've had patients dying where they only remember me [because] I'm here all the time, and he knows I'm the person who can help them and take care of the pain."

The rushing and staffing level impact can be especially acute for nursing home residents in hospice care. Bonnie shared how on a day with insufficient staffing, one of the residents under her care died by herself. "Because no one was around, because we were all with other patients, she died alone," Bonnie said. "No one should have to die by themselves." Shelly Hughes shared that a resident on hospice once passed in the facility where she was working when an RN was not on site. Since only an RN can call the time of death, nothing could be done with the resident's body—by the facility, by the family, or by the funeral home—until an RN arrived.

As these stories illustrate, the staffing levels at nursing homes impact resident well-being from the moment they enter the facility until the very end. "This is our future, this is what we have to look forward to," said Elizabeth Empson, an LPN in Harrisburg, Pennsylvania, for over twenty years. "If you don't have family to take care of you at home, you're going to end up in these facilities. All you're going to get is a bed and three halfway decent meals. And hopefully you get a CNA who cares."

## II.    Investing in the LTC Workforce by Establishing Minimum Nurse Staffing Requirements Will Improve Staffing Shortages and Resident Care Throughout the Industry

In promulgating the Rule, CMS relied on copious evidence indicating that understaffing in LTC facilities is an industry-wide crisis that requires an industry-wide solution. Researchers for the 2022 Abt Study conducted site visits to forty-seven nursing homes located across all ten CMS regions in the country that "represent[] a mix of characteristics, including a range of

10

staffing levels, quality ratings, and resident acuity." 2022 Abt Study at 20, C-60. Over the course of these site visits, "researchers interviewed almost 500 nursing home leaders, direct care staff, residents, and their families." *Id.* at C-60. The Study found that, "[o]verall, respondents reported pervasive short staffing in their nursing homes." *Id.* at 34. A majority of nursing staff respondents reported working short-staffed multiple times a week, and "[o]nly about half . . . reported that their typical assignment was reasonable to provide safe and high-quality care." *Id.* at 26–27, 34. Nursing staff consistently reported that short staffing "affects their ability to provide comprehensive, resident-centered, safe, and high-quality nursing care" and causes "emotional and physical burnout from having high resident assignments." *Id.* at 24, 33–34. These findings are consistent with the experiences of SEIU members and other nursing home workers across the country, who overwhelmingly support CMS's conclusion that investing in the workforce by requiring minimum nurse staffing levels will enable LTC facilities to provide safe, quality resident care.

### A. Understaffing Is Pushing Nursing Home Workers Throughout the Country to Their Breaking Point

When researchers for the 2022 Abt Study asked nursing staff "how short staffing affects their personal health and well-being, the overwhelming majority . . . reported physical, emotional, and mental burnout from working short staffed, as well as lasting impacts on their well-being." 2022 Abt Study at 30. These negative impacts of understaffing, which include missed breaks, physical injuries, exhaustion, and emotional turmoil, profoundly affect the lives of nursing home workers and the residents they care for.

Understaffing gives nursing home workers less time to complete more tasks, meaning they often have to choose between taking their breaks and providing adequate care. As a result, many work through their breaks, making them more prone to burnout and more likely to leave

the profession. *See id.* ("As a result of short staffing, respondents described not being able to take breaks they need, which had consequences for their physical health."). CNA Christina Lockyer, said it is unrealistic to take her fifteen-minute breaks and provide care for her residents at the same time. "If I were to take my fifteen-minute breaks I would not be able to finish my job," she explained. "There is no extra thirty minutes in my time." According to Maria Navarette, a CNA at a nursing home in Anaheim, California, the consequences for residents if nursing staff take their scheduled breaks can be dire. "If you went to your lunch break and you didn't get to the patient, it's not fair that they have to sit soiled. Or they have skin break down, or scabies, or fungus. It's a chain of things that happen if you don't get to what you are supposed to do."

Establishing minimum staffing requirements can help nursing staff avoid the dilemma of deciding between their own comfort and residents' health outcomes. "When staffing ratios were better [six residents to one CNA], we took breaks as scheduled," said CNA LaQuitta Brown. "We had them scheduled and covered each other when we went on them." Now that her facility schedules fewer staff per shift and LaQuitta can be responsible for up to fifteen residents, that is no longer the case, and it has taken a toll on her mental health and on the quality of care she is able to provide. "The breaks are for you to rest mentally," LaQuitta said. "The break is for you to reset your day so you can give the best possible care and be the ideal worker that you are supposed to be."

Working in a nursing home is a physically demanding job, and asking nursing assistants to do more with less staffing leads to over exertion and workplace injuries. "When you're moving, moving, moving, you get hurt," said LeeAnn Webster about her experience as a CNA. As a result, CNAs "experience significantly higher rates of on-the-job injuries" than the average worker. *See* Sebastian Martinez Hickey et al., Econ. Pol'y Inst., *The State of the Residential Long-Term Care Industry* 2–3 (2022). One of the most common causes of workplace injuries for

nursing assistants is when they are asked to lift heavier patients who require multiple staff members to be lifted safely. Shelly Hughes said that "every single day" there is a scenario where two or more CNAs are needed to safely lift a resident, but not enough staff are available. These scenarios, directly caused by staffing shortages, are ripe for injuries and are a common issue across facilities. According to CNA Amy Runkle, "If you have a big patient and they've fallen, and we only have three small CNAs that night that aren't strong, we have trouble getting them off the floor." Each time a CNA attempts to lift a resident who requires maximum assistance, they risk an injury. LPN Bonnie Gaudreau has personally experienced this pain over the years, saying that she has hurt her back trying to lift patients. "With all the years I've done the job, I physically can feel the effects of what I've done over the years," Bonnie said, especially in her back, shoulder, and neck.

In addition to the physical toll, many nursing assistants report feeling tremendous levels of stress caused by their guilt over not having time to provide the care they know their residents deserve. Maria Navarette is frequently "stressed out trying to get to everyone, but when you get to that person, you wish you could do more. If that were my mom, if that were my grandma, I wish I could take care of that person as if they were my own, but if the next person is waiting for me, I'll just try to do the best that I can." Maria sees that stress in her coworkers, too, noting, "we have CNAs that are so overwhelmed that they are crying in the bathroom because they can't get through the day." Ana Flores noted that she and many other CNAs are overwhelmed with guilt from being unable to provide residents with the care they deserve. "We're under a lot of pressure and we have a lot of stress. And this is terrible because it's our job, but if we don't have enough time for everyone and what we need to do, we feel bad because we can't finish what we need to do for the residents," Ana said. "When you know you have too many residents and not enough time for everyone, you feel bad that you don't finish."

Understaffing in LTC facilities has created a national mental health crisis among nursing home workers, forcing many to choose between their careers and their personal well-being. Long days with no breaks, heightened risks of injury, and overwhelming resident assignments take an enormous toll on workers' lives, both in the workplace and at home. "When we leave our feet are killing us, our backs are hurting, we are emotionally drained, we are extremely tired. And when you get home you still have children, a husband, a house to clean," said Amy Runkle. "You are so tired it affects everything in your personal life."

      **B.**    **The Rule Will Address the Nursing Staff Shortage in the LTC Industry by Reducing Turnover Caused by Chronic Understaffing and Improving Retention**

Understaffing causes LTC facilities to churn through nursing staff at extremely high rates because impossible workloads, increasing responsibilities, and a lack of career advancement opportunities are forcing countless workers out of the industry. *See* Nat'l Consumer Voice for Quality Long-Term Care, *High Staff Turnover: A Job Quality Crisis in Nursing Homes* 1 (2022), https://theconsumervoice.org/uploads/files/issues/High_Staff_Turnover-A_Job_Quality_Crisis_in_Nursing_Homes.pdf. This dynamic deters new nursing staff from entering the LTC industry and is causing experienced workers to leave the field in droves. *See* Dee Gill, *Codifying the Nursing Home Industry's Elusive, Alarming Turnover Rates*, UCLA Anderson Rev. (2021), https://anderson-review.ucla.edu/codifying-the-nursing-home-industrys-elusive-alarming-turnover-rates/ ("Averages, rather than medians, for turnover at nursing homes are even higher—140.7% for RNs, 114.1% for LPNs, 129.1% for CNAs—because some nursing homes have annual turnover exceeding 300%.").

CNA Shelly Hughes has seen the impact that understaffing has had on new CNAs. "For each class of twenty registered nurses aides that come in and start working, we are lucky if there are one or two people left at the end of the month," Shelly shared. "The instructors do their best

to prepare them for the reality of working in a nursing home, but nothing that happens sitting in the classroom can prepare you. You have an idea of what good care looks like, and then you get out on the floor and realize it's kind of impossible to take good care of fifteen people at once."

Understaffing also has a negative impact on workers who have been in the industry for years. According to Amy Runkle, "People don't want to stay when they work like that. They might take a dollar or two [pay] cut down the street to work. I would rather feel better after my job all the way around, come home, and I still have some energy to interact with my family, the kids, the husband, and still have a life outside the job." LaQuitta Brown shared that when she first started working as a CNA she would be responsible for no more than six residents, and now it is ten "on a good day" and regularly up to fifteen. This has caused her to cut her hours because she cannot work at those staffing levels "with a conscious heart. I know that you can't give good care to fifteen [residents]."

Plaintiffs claim that an "ongoing nationwide shortage of RNs and [CNAs]" will make "compliance [with the Rule] practically impossible" for LTC facilities. Pls.' Mem. Supp. Summ. J. at 4. However, Plaintiffs confuse a workforce shortage with workers' reduced demand for understaffed, underpaid positions. *See* Hickey et al., *supra*. Nursing homes that provide adequate compensation and a good work environment for nursing staff are less likely to experience astronomical rates of turnover. *See* Nat'l Consumer Voice for Quality Long-Term Care, *supra*, at 2–3. And the recent downturn in employment suggests that there is a pool of workers who could and would return to nursing homes if the pay and working conditions improved. Shelly Hughes believes that in her home state of Washington, "There are plenty of people who . . . would do my job if there were fewer people to care for. We just need to pay them and train them and treat them with respect."

15

For these reasons, the Rule will improve nursing home worker retention by decreasing burnout among veteran staff, improving conditions for new nursing staff, and providing opportunities for career advancement that encourage workers to stay in the industry. Additionally, workers overwhelmingly agree that the new guidelines will make it *easier*— contrary to what Plaintiffs argue—for their facilities to improve retention. "Staffing is why we lose people," Elizabeth Empson explained. "As a union leader I get to talk to [workers] and ask them why they're leaving, and they tell me staffing is the reason why. They come in and get assigned too many people, and they're short on this day, and the next day it's the same. So they leave."

The new standards will also encourage nursing homes to invest in the future of their workforce. Currently, there is often no incentive for CNAs and LPNs to strive for promotions, as those positions simply do not exist. According to LeeAnn Webster, improving RN staffing requirements would encourage more people to try to become RNs. However, as things currently stand, many workers are thinking "if you're an LPN, and there's no position for RN, what would be the point?" LeeAnn also believes that nursing homes currently have no incentive to move CNAs from the floor to higher positions. "There's not a lot of incentive for a CNA to leave the floor. Why would you pay a worker more when you need them on the floor? But that's not how it should be. We should think of people's growth as important." Increasing staffing requirements and creating new positions will incentivize facilities to take that professional growth seriously.

Requiring more RNs will also help to train the next generation of nursing home staff. Tanijah Williams, an LPN in New Haven, Connecticut, with previous experience as a CNA, says that she relies on RNs who are always staffed at her facility to train her. "For a fresh nurse like me, I have a lot of questions, and I feel like only an RN can help me with that," said Tanijah.

16

"Let's say I need to give 0.5 milligrams of OxyContin, and there's only 1 milligram tabs available. What am I supposed to do? I can go to [the RN] and they'll let me know."

### C.     By Creating a Large, Experienced Workforce of Nursing Staff, the Rule Will Improve Resident Care

Losing staff with experience, and being unable to replace them with trained, motivated nursing assistants, has had an adverse impact on resident care. High turnover in a nursing care facility is directly correlated with an increase in the spread of infections in that facility. Hickey et al. *supra.* This is because nursing facilities with less turnover have staff who are more experienced and familiar with policies designed to prevent the spread of infections. Ashvin Gandhi et al., *High Nursing Staff Turnover in Nursing Homes Offers Important Quality Information*, 40 Health Affairs 3, 384 (Mar. 2021). This institutional knowledge is directly connected to saving patients from preventable infections and is only possible with a large, stable nursing workforce. That workforce will be impossible to establish and maintain as long as long-time and brand-new nursing staff continue to abandon the field.

By increasing staffing thresholds, the Rule will allow nursing staff to give residents the dignity of receiving care from staff who have time to treat them like a human being. Many SEIU members speak directly to how improving the staffing ratio at work impacted them and their residents. CNA Joseph Horen shared that the new management for his facility recently changed the staffing goal to 3.4–3.6 hours per resident day ("HRPD"). With this change, he feels that he has enough time to address at least the minimum needs of all of his residents. Elizabeth Empson credited a new state staffing ratio with reducing the number of residents she is responsible for each shift from sixty down to forty, a change that has reduced the accidents that are happening at the facility. Improved staffing ratios have also given both the LPNs and the CNAs "time to actually get to know our residents and their norms," Elizabeth explained, which allows them

provide better and more accurate care. CNA Amy Runkle advocated in her home state of Florida

to raise staffing ratios for CNAs. In 2004, Florida finally raised the CNA staffing ratio in her

state to 2.9 HRPD. Under this ratio, Amy reports that she "had time to slow down . . . for the

benefit of the residents," who would not get lonely or depressed because the staff had time to talk

to them.

       Plaintiffs contend that the staffing levels required by CMS are "irrational and

unattainable" because the Rule "'exceed[s] the existing minimum staffing requirements in nearly

all' of the 38 States (plus the District of Columbia) that have adopted such requirements." Pls.'

Mem. Supp. Summ. J. at 3 (quoting 89 Fed. Reg. at 40877). But for many nursing home workers,

these state minimum staffing requirements are nowhere near the levels needed to provide

residents with high quality care. In 2023, Florida, after having raised the staffing ratio to 2.9,

lowered its minimum CNA staffing requirement to a ratio of 2.0 HRPD—significantly lower

than the CNA staffing ratio of 2.45 HRPD established by the Rule. Fla. Stat. § 400.23(3)(b).

Under this standard, Amy Runkle is now responsible for up to thirty residents per overnight shift.

Despite complying with Florida law, these assignments leave Amy with less than five minutes to

care for each resident during her rounds. "Sometimes a person can go up to three hours between

touches," Amy said, referring to how often she is able to check on and attend to a resident during

her shift. "If you're busy, and you run into situations like someone falling or being really sick,

that means it takes longer to get back to somebody. You can't see everybody in two hours. It's

just impossible." Since Florida reduced the staffing ratio for CNAs from 2.9 to 2.0, Amy has

noticed that many residents:

> [L]ay in the bed most of the time and watch TV. Sometimes they
> just stare at the walls. We don't have the time to sit there and talk to
> them. They sit in urine and feces more than normal. They break
> down with sores. It's terrible. Sometimes they're not getting their
> showers. Or eating, they're getting so lonely and depressed that they

> just don't want to eat. That compromises the integrity of their skin and they kind of go downhill from there.

As Amy's experiences show, nursing home staffing requirements in Florida and other states that fall short of the Rule's minimum levels have failed to provide residents with the high-quality care they need. CMS therefore rightly recognized that a federal nursing home staffing standard was needed to protect residents' health and improve the quality of their care nationwide. As Elizabeth Empson explained, "The industry has had plenty of opportunities to fix the staffing issues themselves and hasn't. Someone else has to step in and do it or it will never change."

Nursing home workers are passionate, dedicated caregivers who want nothing more than to provide the best care for the residents they serve. "It's the best. I help people for a living," Shelly Hughes said of her job. "Your coworkers are the best—people who choose a life caring for others are the best. When you choose to spend time helping others, it feeds a part of you that our modern society neglects. It feels good to take care of other people." But workers are exhausted from being understaffed, overworked, and underappreciated and worried about the future of their residents. Maria Navarrete urges decisionmakers to recognize that safe staffing in nursing homes is a deeply personal matter that could directly impact the people they love:

> Let's say your mom is in a nursing home, and she can no longer take care of herself. Would you want the person who is taking care of her giving her the best quality of care and treatment they can have? Do you want them to do it in a hurry because they don't have enough time? . . . [Or] would you make sure there are enough CNAs, [LPNs], and RNs to care for your family member?

After years of weathering punishing working conditions due to understaffing, nursing home workers believe that improving nursing staff standards is long overdue and strongly support CMS's Rule. "I want to see changes," said LPN Bonnie Gaudreau. "Residents deserve more of our time and more CNA time. These are human beings. This is not a factory. How as a country could we think this is an acceptable way to take care of people?"

**CONCLUSION**

For these reasons, the Court should deny Plaintiffs' motion for summary judgment and grant judgment to Defendants.

Dated: November 22, 2024                    Respectfully submitted,


                                            /s/_____
                                            Steven K. Ury, General Counsel*
                                            steven.ury@seiu.org
                                            Monica Jin-Joo Wilk, Assistant General Counsel*
                                            Mac D. McMechan, Law Fellow*
                                            Service Employees International Union
                                            1800 Massachusetts Avenue, NW
                                            Washington, DC 20036
                                            Tel. (213) 440-4547
                                            Fax (202) 429-5565

                                            *Counsel for Amicus Curiae*
                                            *Admitted *pro hac vice*